STATE OF CONNECTICUT *v.* MICHAEL J. GILBERT
(14735)

PETERS, C. J., BORDEN, BERDON, NORCOTT and KATZ, Js.

Argued January 12—decision released March 18, 1994*

*Mark Shapera,* special public defender, for the appellant (defendant).

*James M. Ralls,* assistant state's attorney, with whom, on the brief, were *Mark S. Solak,* state's attorney, and *Mark Stabile,* assistant state's attorney for the appellee (state).

KATZ, J. The principal issue in this certified appeal is whether the defendant's inability to remember the events of his life from two weeks before to five weeks after a motor vehicle accident prevented him from receiving a fair trial and thereby resulted in his being

---

* March 18, 1994, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

improperly convicted, after a jury trial, of manslaughter in the second degree with a motor vehicle in violation of General Statutes § 53a-56b, misconduct with a motor vehicle in violation of General Statutes § 53a-57, and operating a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes § 14-227a. In upholding the trial court's judgment, the Appellate Court held that under the facts of the case, the defendant had not been deprived of his rights to due process of law as provided by the fourteenth amendment to the United States constitution and article first, §§ 8 and 20, of the Connecticut constitution. *State* v. *Gilbert,* 30 Conn. App. 428, 436, 620 A.2d 822 (1993).[1] We agree.

The pertinent undisputed facts as set forth in the Appellate Court opinion are as follows. "On August 3, 1990, at approximately 8:30 p.m., the defendant, Michael J. Gilbert, left Hank's Restaurant on Route 6 in Brooklyn, Connecticut. He had been there for a few hours and had consumed some alcoholic drinks and pizza. Outside the restaurant, he smelled of alcohol, his speech was slurred and his balance was unsteady. He shuffled when walking and faltered getting into his vehicle, a 1981 Ford Escort. He slumped out of the driver's window and dropped his keys. His eyes were bloodshot and watery. He was upset and planned to drive to another bar located in another town.

"Some time before 9 p.m., the defendant, driving in the westbound lane on Route 6 with his headlights off, collided with a vehicle being operated in the eastbound lane. Route 6 is a two lane road, with one lane in each direction; the posted speed limit is forty-five miles per hour. The weather at the time was clear, and the road

---

[1] We granted the defendant's petition for certification limited to the following issue: "Under the circumstances of this case, did the defendant's amnesia prevent him from receiving a fair trial?" *State* v. *Gilbert,* 225 Conn. 917, 623 A.2d 1025 (1993).

conditions were dry. The driver of the other vehicle, a 1980 Toyota Corolla, died as a result of injuries she received in the accident. The defendant was found unconscious in the driver's seat of his car. He smelled of alcohol, and there were several open and empty beer cans in the vehicle, as well as a number of unopened cans of beer. The point of impact appeared to be in the eastbound lane, in which the victim was driving.

"The defendant was taken to Day Kimball Hospital in Putnam, where, as part of the hospital's regular course of diagnosis and treatment of trauma patients, a blood sample was taken. The test revealed that the defendant's blood alcohol level per deciliter was 0.226, which translates to a 0.194 percent alcohol ratio. As a result of the accident, the defendant suffered a traumatic brain injury which resulted in temporary paralysis and coma. In addition, the defendant suffered some loss of memory." Id., 429–30.

Following a competency hearing held pursuant to General Statutes § 54-56d,[2] at which the court, *Sfer*-

[2] General Statutes § 54-56d provides in pertinent part: "(Formerly Sec. 54-40). COMPETENCY TO STAND TRIAL. (a) COMPETENCY REQUIRED. DEFINITION. A defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense.

"(b) PRESUMPTION OF COMPETENCY. A defendant is presumed to be competent. The burden of proving that the defendant is not competent by clear and convincing evidence and the burden of going forward with the evidence are on the party raising the issue. The burden of going forward with the evidence shall be on the state if the court raises the issue. The court may call its own witnesses and conduct its own inquiry.

"(c) REQUEST FOR EXAMINATION. If at any time during a criminal proceeding it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency.

"(d) EXAMINATION OF DEFENDANT. REPORT. If the court finds that the request for an examination is justified and that, in accordance with procedures established by the judges of the superior court, there is probable cause to believe that the defendant has committed the crime for which he is

*razza, J.,* found the defendant competent to stand trial, the trial court considered the defendant's motion to dismiss in which he raised the claim that he could not receive a fair trial because of his amnesia. At the hearing on the motion to dismiss, the defendant argued, pursuant to *Wilson* v. *United States,* 391 F.2d 460, 463–64

charged, the court shall order an examination of the defendant as to his competency. The court either may appoint one or more physicians specializing in psychiatry to examine the defendant or it may order the commissioner of mental health to conduct the examination either by a clinical team consisting of a physician specializing in psychiatry, a clinical psychologist and a psychiatric social worker, or by one or more physicians specializing in psychiatry. If the commissioner of mental health is ordered to conduct the examination, he shall select the members of the clinical team or the physician or physicians. If the examiners determine that the defendant is not competent, they shall then determine whether there is substantial probability that the defendant, if provided with a course of treatment, will regain competency within the maximum period of any placement order under this section. The court may authorize a physician specializing in psychiatry, a clinical psychologist or a psychiatric social worker selected by the defendant to observe the examination. Counsel for the defendant may observe the examination. The examination shall be completed within fifteen days from the date it was ordered. The examiner or examiners shall prepare and sign, without notarization, a written report and file it with the court within ten days of the completion of the examination. On receipt of the written report, the clerk of the court shall cause copies to be delivered immediately to the state's attorney and to counsel for the defendant.

"(e) HEARING. The court shall hold a hearing as to the competency of the defendant no later than ten days after it receives the written report. Any evidence regarding the defendant's competency, including the written report, may be introduced at the hearing by either the defendant or the state. If the written report is introduced, at least one of the examiners must be present to testify as to the determinations in the report, unless his presence is waived by the defendant and the state. Any member of the clinical team shall be considered competent to testify as to the team's determinations. A defendant and his counsel may waive the court hearing only if the examiners, in the written report, determine without qualification that the defendant is competent.

"(f) COURT FINDING OF COMPETENCY OR INCOMPETENCY. If the court, after the hearing, finds that the defendant is competent, it shall continue with the criminal proceedings. If it finds that the defendant is not competent, it shall also find whether there is substantial probability that the defendant, if provided with a course of treatment, will regain competency within the maximum period of any placement order permitted under this section."

(D.C. Cir. 1968), for the application of a multifactor approach to the question of whether a defendant's loss of memory precludes his prosecution. Under *Wilson,* in determining the effect of amnesia on the trial's fairness the trial court should consider six factors: (1) the extent to which the amnesia affected the defendant's ability to consult with and assist his lawyer; (2) the extent to which the amnesia affected the defendant's ability to testify on his own behalf; (3) the extent to which the evidence in the suit could be extrinsically reconstructed in view of the defendant's amnesia, including evidence relating to the crime itself as well as any reasonably possible alibi; (4) the extent to which the government assisted the defendant and his counsel in that reconstruction; (5) the strength of the prosecution's case, with the most important consideration pertaining to whether the government's case is such as to negate all reasonable hypotheses of innocence; and (6) any other facts and circumstances that would indicate whether or not the defendant had a fair trial. Id.

The trial court considered the specific findings required by *Wilson* to be "impractical and unnecessary to a determination of whether a defendant would be denied due process of law if forced to stand trial." The court instead adopted the approach employed by the Second Circuit Court of Appeals in *United States* v. *Sullivan,* 406 F.2d 180, 186 (2d Cir. 1969). Unlike the *Wilson* test that requires a trial court both to conduct a pretrial competency hearing and make a posttrial determination as to whether the defendant had been able to perform " 'the functions essential to the fairness and accuracy of the particular proceedings in which he [was] presently involved' " as measured by six factors; *Wilson* v. *United States,* supra, 391 F.2d 463; the *Sullivan* test requires a more limited inquiry. The *Sullivan* test focuses on whether amnesia

prevented the defendant from forming the requisite intent for the offenses charged and on whether the defendant was competent at the time of trial to consult rationally with counsel and to understand the nature of the proceedings against him. *United States* v. *Sullivan,* supra, 186.

Although, in deciding the motion to dismiss, the trial court expressed its preference for the *Sullivan* test, it nevertheless performed a case-by-case analysis and concluded that the defendant's amnesia did not severely undermine his present ability to consult rationally with his attorney or strip him of the opportunity to reconstruct events independent of his recollections. As part of its evaluation, the court reviewed both reports that had been prepared pursuant to § 54-56d for assessment of the defendant's competency to stand trial. Each report concluded that the defendant could communicate and consult rationally with his attorney and could provide information regarding some of the related charges, including the lapse of insurance on his vehicle.

The trial court found that the only significant consequence of the accident had been the defendant's loss of memory. The court noted that the charges did not require specific intent or guilty knowledge. It further remarked that there was an open file policy with regard to discovery, so that the defendant had access to: the state's accident reconstruction report; names, addresses and statements of witnesses; photographs and information as to the physical evidence found at the scene; and medical information, including blood alcohol levels, on both the victim and the defendant. The court observed that the defendant could not claim alibi or mistaken identification in light of the evidence that he had been found alone in his car immediately after the accident. The court determined, therefore, that the significant issues were intoxication and causation, matters usually proven by physical evidence and

independent witnesses. In denying the defendant's motion to dismiss, the trial court concluded that the defendant had access to all of the available information necessary to reconstruct the accident, and that his amnesia did not interfere with his ability to have a fair trial.

During the trial before Judge Dunn, the defendant made a motion in limine to prevent the introduction of "testimony concerning [his] conversations . . . during the period immediately preceding the accident," claiming that he could not confront such witnesses due to his amnesia. Specifically, the defendant argued that his amnesia prevented him from "confronting" two witnesses, Delana O'Neill and Henry Hewig, with whom he allegedly had conversed outside of Hank's Restaurant before the accident.[3] After the trial court denied the defendant's motion in limine, O'Neill and Hewig testified for the state. The defendant cross-examined the latter regarding the direction Hewig saw him take outside the restaurant, the appearance of the defendant's eyes, and certain purported inconsistencies between Hewig's testimony and the statement that Hewig had given to the state police two days after the accident.[4] The defendant did not cross-examine O'Neill, and did not present any independent evidence regarding his encounter with those two men.

Following the jury's verdict of guilty of all the crimes charged, the defendant moved for a judgment of acquit-

[3] In ruling on the motion in limine, the trial court, *Dunn, J.,* did not engage in an evaluation like the one conducted in connection with the motion to dismiss. Instead, the trial court expressed familiarity with the earlier ruling and then denied the motion. Following the trial, the defendant made a motion for judgment of acquittal and again relied upon *Wilson* v. *United States,* supra, 391 F.2d 460. Once again, the trial court, well aware of the issues, denied the motion.

[4] In his statement, given twenty-four hours after the accident, Hewig failed to mention that he had tried to prevent the defendant from driving. Notably, the defendant remarked, Hewig first remembered that fact eighteen months later while on the witness stand.

tal, relying on the *Wilson* factors. The trial court denied the motion, and rendered a judgment of conviction. The defendant appealed from the judgment of conviction to the Appellate Court.

Without specifically endorsing the *Wilson* or the *Sullivan* approach, the Appellate Court concluded from its review of the record that "the trial court reasonably could have concluded that the defendant possessed a 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as factual understanding of the proceedings against him' . . . and that the defense had an ample opportunity to reconstruct the events of the evening in question and to cross-examine witnesses, even without the defendant's specific recollection of events." (Citation omitted.) *State* v. *Gilbert,* supra, 30 Conn. App. 436. Accordingly, the Appellate Court affirmed the judgment of conviction. This appeal followed.

The defendant asks this court to adopt the analysis set forth in *Wilson* v. *United States,* supra, 391 F.2d 462, in considering his claim that his memory loss should have precluded his prosecution. In *Wilson,* the court of appeals rejected the argument that amnesia should result in an absolute bar to prosecution when the defendant is fully competent to stand trial. See *Leach* v. *Kolb,* 911 F.2d 1249, 1260–61 (7th Cir.), cert. denied sub nom. *Leach* v. *McCaughtry,* 498 U.S. 972, 111 S. Ct. 441, 112 L. Ed. 2d 424 (1990) (amnesia is not a per se bar to prosecution of an otherwise competent defendant); accord *Davis* v. *Wyrick,* 766 F.2d 1197, 1202 (8th Cir. 1985), cert. denied, 475 U.S. 1020, 106 S. Ct. 1209, 89 L. Ed. 2d 322 (1986); *State* v. *McClendon,* 103 Ariz. 105, 107, 437 P.2d 421 (1968); *Reagon* v. *State,* 253 Ind. 143, 153–54, 251 N.E.2d 829 (1969); *Commonwealth* v. *Lombardi,* 378 Mass. 612, 615, 393 N.E.2d 346 (1979); see also annot., Amnesia

As Affecting Capacity to Commit Crime or Stand Trial, 46 A.L.R.3d 544 (1972 & Sup. 1993). Notwithstanding that position, the *Wilson* court also rejected the government's contention that amnesia, without an accompanying disease or defect, can *never* render an accused incompetent to stand trial. *Wilson* v. *United States,* supra, 463; see *United States* v. *Rinchack,* 820 F.2d 1557, 1564 (11th Cir. 1987). Rather, the court held that due process requires a pretrial hearing, and in the event that a trial is held, a posttrial hearing to evaluate, on a case-by-case basis, the effect of amnesia both on the defendant's competency to stand trial and on the fairness of the trial. *Wilson* v. *United States,* supra, 463.

This accords with the principle articulated by this court that "in all cases involving what is or is not due process . . . no hard and fast rule can be laid down. The pattern of due process is picked out in the facts and circumstances of each case." (Internal quotation marks omitted.) *State* v. *Lovelace,* 191 Conn. 545, 552, 469 A.2d 391 (1983), cert. denied, 465 U.S. 1107, 104 S. Ct. 1613, 80 L. Ed. 2d 142 (1984); see *Tedesco* v. *Stamford,* 222 Conn. 233, 244, 610 A.2d 574 (1992). We continue to adhere to that position and agree with the many jurisdictions that have either followed the *Wilson* approach strictly or have engaged in a factual analysis of the effect of amnesia on the fairness of the trial. See *United States* v. *Villegas,* 899 F.2d 1324, 1341 (2d Cir. 1990); *United States* v. *Rinchack,* supra, 820 F.2d 1569; *United States* v. *Mota,* 598 F.2d 995, 998 (5th Cir. 1979), cert. denied sub nom. *Flores* v. *United States,* 444 U.S. 1084, 100 S. Ct. 1042, 62 L. Ed. 2d 770 (1980); *United States* v. *Borum,* 464 F.2d 896, 899–900 (10th Cir. 1972); *State* v. *McClendon,* supra, 103 Ariz. 107–109; *State* v. *Ferguson,* 26 Ariz. App. 285, 287–88, 547 P.2d 1085 (1976); *Parson* v. *State,* 275 A.2d 777, 787 (Del. 1971); *State* v. *Wynn,* 490 A.2d 605, 608 (Del. Super. 1985); *Aldridge* v. *State,* 247 Ga. 142, 146, 274

S.E.2d 525 (1981); *State* v. *Owens,* 248 Kan. 273, 280, 807 P.2d 101 (1991); *State* v. *Gilder,* 223 Kan. 220, 224, 574 P.2d 196 (1977); *State* v. *Blake,* 209 Kan. 196, 200–201, 495 P.2d 905 (1972); *Commonwealth* v. *Lombardi,* supra, 378 Mass. 615–16; *People* v. *Francabandera,* 33 N.Y.2d 429, 436–38, 310 N.E.2d 292, 354 N.Y.S.2d 609 (1974); *State* v. *Vassar,* 279 N.W.2d 678, 682–83 (S.D. 1979); *State* v. *McIntosh,* 137 Wis. 2d 339, 347, 404 N.W.2d 557 (1987).

In examining the factors set forth in *Wilson,* we particularly note that it is "the probability of prejudice, not [the] lack of memory per se, [that is] controlling." *Wilson* v. *United States,* supra, 391 F.2d 464 n.4. All that is required is that the defendant and counsel be able to " 'perform the functions essential to the fairness and accuracy of the particular proceedings . . . .' " Id., 463. The *Wilson* court held that the standard of review is whether there exists a "reasonable basis for any contention that the outcome was significantly affected by [the] appellant's lack of memory." Id., 464 (Levanthal, J., concurring). Due to the plethora of evidence available to reconstruct events, independent of both the defendant and the victim, and the absence of a showing that the defendant was unable to present any potential defense, we conclude that the defendant's amnesia did not "significantly affect" the outcome of the trial.

Under *Wilson,* the first factor is the extent to which the defendant's amnesia has affected his ability to consult with and assist his attorney, separate and apart from his memory loss. *United States* v. *Rinchack,* supra, 820 F.2d 1569; *United States* v. *Swanson,* 572 F.2d 523, 526 (5th Cir. 1978). The trial court found that the defendant had "no difficulty" understanding the nature of the proceedings or in "communicating with others," and that he was competent to stand trial and therefore was able to assist his attorney in his defense. The

defendant does not challenge that finding on appeal. The trial court also found that the defendant did not appear to have difficulty consulting with his counsel as to potential defenses and witnesses. As the defendant states in his brief to this court, his defense was to contest "two essential elements of the state's case, namely, that he was under the influence . . . [and] that . . . the accident took place in the other driver's lane." There was no paucity of witnesses or evidence on these elements from the five defense witnesses: the bartender and permittee of the restaurant; an expert in accident reconstruction; and two employees of the automobile repair shop where the defendant's car was taken. It was also reasonably possible for counsel to identify and question other potential witnesses, i.e., relatives and persons who worked with, lived near or otherwise had been associated with the defendant during that time period.

Nonetheless, the defendant contends that his inability to remember events that had occurred prior to the accident left his counsel with "no idea how to cross-examine" the state's witnesses O'Neill and Hewig, who testified as to his intoxicated condition at the restaurant. We cannot fathom, however, how the defendant's ability to recall these events would have served to alter or improve defense counsel's cross-examination. The defendant failed to suggest any scenarios upon which the trial court could have ruminated.

The defendant also complains that he was "stuck with any inculpatory answers" as to his own statements given at the restaurant. The record belies this assertion. In fact, the defendant presented evidence to contradict the state's witnesses. Tracy Elliott, the bartender, and Roland LaCharite, the permittee of Hank's Restaurant, testified to the defendant's apparent sobriety during the same time frame. Elliott remembered that the defendant had eaten one half of

a pizza and had used the telephone, and both she and LaCharite noted that the defendant had not staggered or swayed. Elliott also indicated that O'Neill and Hewig had not been at the restaurant that night. In addition, the automobile repair shop personnel indicated that there had been leftover pizza in the defendant's car, which neither O'Neill nor Hewig mentioned, and which might have indicated both that the defendant had been less affected by his alcohol consumption than the state's evidence suggested and that the state's witnesses' observation of him had been less than accurate.

Moreover, the defendant overestimates the significance of the brief conversation O'Neill and Hewig related having had with him. According to O'Neill and Hewig, the defendant admitted that he had had a few drinks, that he was upset, that he was driving to another bar and that he did not want a taxi. The state did not, however, rely on that testimony as its primary evidence. On the contrary, the state's case largely depended upon later events, such as the reconstruction of the accident itself and the medical testimony regarding the effects of the defendant's blood alcohol level. Furthermore, the evidence of what had occurred prior to the accident consisted largely of behavioral and not testimonial evidence. The defendant's actions—his shuffling, faltering, unbalanced walk, his slumping out his window, and his dropping of his keys—together with his bloodshot and watery eyes, his slurred speech, and his odor of alcohol, were significantly more important to the state's case than his few words.

The second factor under *Wilson*, whether amnesia affected the defendant's ability to testify on matters other than the event that gave rise to his amnesia; see *United States* v. *Rinchack*, supra, 820 F.2d 1569; also weighs against him. Because "inebriation and causation" were, as the trial court remarked, the only real issues in the case, in the absence of any claim that he

was otherwise unable to take the stand and testify, the defendant presumably could have provided, for example, the following pertinent exculpatory testimony: that he was not an alcoholic; that he did not drink and drive; that he knew the road and the accident site; that O'Neill and Hewig were not truthful; and that he could not have been inebriated in light of the fact that he had eaten one half of a pizza.

Other testimony that could have been exculpatory, but for the defendant's amnesia, was very limited. As the trial court found, this case did not involve a defense of alibi or mistaken identity: "[T]he question of operation appears uncontrovertible given the evidence that the defendant was found alone in his own vehicle after the crash and witnesses observed him driving onto Route 6 just before the crash." Although the defendant was obviously unable to provide a specific self-serving denial of wrongdoing, he has not provided any explanation or offer of proof regarding the type of testimony that he could have offered, the reasons he did not take the stand, or why we should presume that, but for the amnesia, he could have established a defense. "It is always possible that a defendant could gain an acquittal by perjuring himself, or more conscionably by presenting such a sympathetic figure on the witness stand that the jury would have used the mercy-dispensing power that it has in fact, though not in law. But such possibilities of prejudice, however realistic, do not suffice to prohibit the entry of a judgment on a verdict of guilty." *Wilson* v. *United States,* supra, 391 F.2d 465 (Leventhal, J., concurring). The present record fails to demonstrate that the defendant would not have made the same tactical decision not to testify even if amnesia had not been a factor. Furthermore, the record does not indicate that, aside from his amnesia, the defendant's ability to testify had otherwise been unfairly limited.

The third inquiry under *Wilson* explores whether the facts were capable of being reconstructed independent of the defendant's own recollection. Here, there was an abundance of evidence as to what had occurred: four witnesses, two for the state and two for the defense, testified to events at the restaurant immediately preceding the accident; four accident reconstruction experts, three for the state and one for the defense, along with a large amount of physical evidence, served to reconstruct the accident itself; and medical evidence informed the jury about the defendant's blood alcohol level shortly after the accident, and offered "relation back"[5] testimony as to his alcohol level, and its effects on his ability to drive. Finally, as the trial court noted, because the offenses at issue do not require specific intent or knowledge, they were "particularly amenable to reconstruction, despite the defendant's memory loss, because the defendant's contemporaneous mental state is immaterial." See *Commonwealth* v. *Lombardi,* supra, 378 Mass. 616 (listing nature of crime as factor to examine).

The fourth factor under *Wilson* is the extent to which the government assisted the defense in the reconstruction of the accident. The trial court found that the state had "provided the defense with open discovery," including a copy of a "twenty-two page accident investigation report . . . [that] provides the names and statements of the defendant's friends who talked with him and observed his physical condition as he exited the restaurant, entered his vehicle, and drove off onto

---

[5] As the Appellate Court explained in *State* v. *Geisler,* 22 Conn. App. 142, 162, 576 A.2d 1283, cert. denied, 215 Conn. 819, 576 A.2d 547 (1990), vacated on other grounds, 498 U.S. 1019, 111 S. Ct. 663, 112 L. Ed. 2d 657, on remand, 25 Conn. App. 282, 594 A.2d 985 (1991), aff'd, 222 Conn. 672, 610 A.2d 1225 (1992), General Statutes § 14-227a requires expert evidence extrapolating the results of a blood alcohol test back to the time of the operation of the motor vehicle.

Route 6." The report also provided the names and statements of witnesses at the accident scene, and disclosed "a wealth of physical evidence obtained at the scene and thereafter, including debris dispersal analysis, diagrams, measurements, an inventory of the contents of the vehicles, and other material pertinent to accident reconstruction. It comprises medical information regarding the cause of death of the victim and the medical condition of the defendant, including the blood alcohol ratio for both parties." The report also indicated that "photographs of the accident scene and the vehicles on the date of the accident and at later times" had been taken.

When the state called Trooper Robert Mantho of the Connecticut state police to the stand, the defendant noted that he had no information about him. The defendant now argues that because the state failed to disclose Mantho's "role and conclusions prior to his testimony," the state failed adequately to assist him in the reconstruction of the accident. This argument is without merit.

Mantho, the state's accident reconstruction expert in the present case, testified that his conclusions were "dependent on the photograph evidence, primarily, and the documented measurements that were provided to me by the on-scene troopers." As the trial court indicated at the hearing on the motion to dismiss, the defendant had the twenty-two page accident report that disclosed all material pertinent to accident reconstruction. In addition, when the defendant complained that he did not know who Mantho was, other than that he was an expert witness, the court offered defense counsel additional time to prepare for cross-examination and to call a rebuttal expert, and allowed him to discuss Mantho's testimony with the defense expert despite the sequestration order. The defendant has not claimed a

violation of any Practice Book provision,[6] and does not dispute that the state had an open file policy in this case. Nor does the defendant suggest that his own reconstruction expert had been hindered in any way. There

---

[6] Practice Book § 741 provides: "Upon a written motion made by a defendant within ten days after the entry of a plea, the prosecuting authority, within the time set by the judicial authority, shall disclose in writing the existence of and allow the defendant to inspect, copy, photograph and have reasonable tests made on any of the following relevant materials;

"(1) Exculpatory information or materials;

"(2) Books, tangible objects, papers, photographs, or documents obtained from or belonging to the defendant;

"(3) Adequately identified books, tangible objects, papers, photographs, or documents which are within the possession, custody, or control of any governmental agency, and which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial;

"(4) Copies of records or reports of physical or mental examinations of the defendant made in connection with the offense charged which are within the possession, custody, or control of any governmental agency, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting authority, and which are obtainable with the permission of the defendant;

"(5) Copies of the defendant's prior criminal record, if any, which are within the possession, custody, or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting authority;

"(6) Copies of results or reports of scientific tests, experiments or comparisons made in connection with the particular case which are known to and obtainable by the prosecuting authority and within the possession, custody, or control of any governmental agency, and which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial; or

"(7) Buildings, places, or portions thereof, which are in the possession, custody, or control of any governmental agency and which are material to the defense or about which the prosecuting authority intends to introduce evidence in chief at the trial.

"In addition to the foregoing, the defendant shall be entitled to disclosure of exculpatory materials in accordance with any applicable constitutional and statutory provisions."

The defendant has not claimed that the state failed to disclose any report by Mantho based upon his examination of the data collected by officers at the scene.

is little question that the defendant, therefore, received ample assistance by the state in reconstructing the accident.

The fifth factor under *Wilson* is the strength of the state's case.[7] The record reflects that three separate officers with experience in accident reconstruction opined, based upon an extensive evaluation of all pertinent evidence at the scene, that the defendant's car had crossed over into the victim's lane. Two lay witnesses, friends of the defendant with no apparent reason to accuse him falsely, testified that they had been concerned about his driving because his actions and speech had indicated that he was under the influence. An expert medical witness also testified that shortly after the accident the defendant had had a blood alcohol level of 0.226, far above the level required for conviction under General Statutes § 14-277a (a) or (b).[8] The

---

[7] This exact inquiry was not made by the trial court at the hearing on the motion to dismiss. The trial court, however, did acknowledge the "wealth of physical evidence" taken from the scene, photographs of the accident scene, medical information including the blood/alcohol ratio for both drivers, as well as "other material pertinent to accident reconstruction." This report certainly provided the trial court with a good analysis of the strengths and weaknesses of the state's case.

[8] General Statutes § 14-227a provides in relevant part: "OPERATION WHILE UNDER THE INFLUENCE OF LIQUOR OR DRUG OR WHILE IMPAIRED BY LIQUOR. (a) OPERATION WHILE UNDER THE INFLUENCE. No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if he operates a motor vehicle on a public highway of this state or on any road of a district organized under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or on any private road on which a speed limit has been established in accordance with the provisions of section 14-218a, or in any parking area for ten or more cars or on any school property (1) while under the influence of intoxicating liquor or any drug or both or (2) while the ratio of alcohol in the blood of such person is ten hundredths of one per cent or more of alcohol, by weight.

"(b) OPERATION WHILE IMPAIRED. No person shall operate a motor vehicle on a public highway of this state or on any road of a district organized

defendant argues that there was conflicting testimony, both as to whether he had been under the influence and as to the lane in which the vehicles collided. The mere fact that there was conflicting evidence, however, does not necessarily make the state's case weak. In sum, the evidence, if credited, amply supported the jury's verdict.[9]

The last area of inquiry under *Wilson* allows the trial court to consider any other relevant criteria in assessing whether the defendant's amnesia should preclude his prosecution. For the first time in this case, the defendant claims that "he could not exercise his civil rights due to his mental disability," i.e., his amnesia, in violation of article first, § 20, of the Connecticut constitution.[10] We decline to consider this claim because, as the state correctly points out, the defendant did not raise it in his appeal to the Appellate Court or in the certified question to this court. On certification, our focus is on the judgment of the Appellate Court. *Cahn* v. *Cahn,* 225 Conn. 666, 671, 626 A.2d 296 (1993); *Essex*

---

under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or on any private road on which a speed limit has been established in accordance with the provisions of section 14-218a, or in any parking area for ten or more cars or on any school property while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor. A person shall be deemed impaired when at the time of the alleged offense the ratio of alcohol in the blood of such person was more than seven-hundredths of one per cent of alcohol, by weight, but less than ten-hundredths of one per cent of alcohol, by weight."

[9] We have said that in order for a defendant to be convicted by proof beyond a reasonable doubt, the jury must conclude that the evidence was sufficient to negate any reasonable hypothesis of innocence. *State* v. *Carpenter,* 214 Conn. 77, 84, 570 A.2d 203 (1990), and cases cited therein. This is the measure by which the evidence prong of the *Wilson* test is judged; *Wilson* v. *United States,* supra, 391 F.2d 464; and in this case was satisfied.

[10] Article first, § 20, of the Connecticut constitution provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

*Leasing, Inc.* v. *Zoning Board of Appeals,* 206 Conn. 595, 599, 539 A.2d 101 (1988). The defendant did not raise the state constitutional claim in the Appellate Court and it does not appear anywhere in the opinion of the Appellate Court. Unlike *State* v. *Joyce,* 30 Conn. App. 164, 188–90, 619 A.2d 872 (1993) (*Heiman, J.,* dissenting), rev'd, 229 Conn. 10, 639 A.2d 1007 (1994), in which the Appellate Court dissent relied on the state constitution and we specifically certified the issue,[11] neither situation is present here.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

[11] In *State* v. *Joyce,* 225 Conn. 911, 623 A.2d 1021 (1993), we certified the following issue: "In the circumstances of this case, were the police, while lawfully in custodial possession of the defendant's clothing, required by either the federal or state constitution to obtain a warrant before transferring the clothing to a state laboratory and subjecting it to chemical analysis?"