******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MANUEL T.*
(SC 20250)

Robinson, C. J., and McDonald, D'Auria, Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted of risk of injury to a child, sexual assault in the first degree, sexual assault in the second degree, and sexual assault in the fourth degree in connection with his alleged sexual abuse of the victim, J, the defendant appealed to the Appellate Court, claiming that the trial court's admission of a video recording of a forensic interview of J and exclusion of screenshots depicting two text messages purportedly sent by J to the defendant's niece, V, constituted harmful error. The Appellate Court upheld the defendant's conviction, concluding that neither evidentiary ruling was an abuse of the trial court's discretion. The Appellate Court specifically concluded that the statements that J made during the interview were admissible under the medical treatment exception to the hearsay rule and that V's testimony was insufficient to authenticate the text messages and that there was not sufficient additional corroboration of V's testimony. On the granting of certification, the defendant appealed to this court. *Held*:

1. This court rejected the defendant's claim that it should overrule prior Appellate Court precedent and adopt a standard under which statements made by a minor child abuse victim during a forensic interview can be admitted under the medical treatment exception to the hearsay rule only if the victim's primary purpose in making those statements was to obtain a medical diagnosis or treatment.

2. The Appellate Court incorrectly determined that the trial court had not abused its discretion in excluding, for lack of authentication, the screenshots of the text messages purportedly sent by J to V: the defendant established a prima facie case of authentication through V's testimony, and any doubts as to V's credibility or as to the source of the messages went to the weight, rather than to the admissibility, of the text messages; moreover, the exclusion of the text messages was not harmless because the state's case was not particularly strong insofar as there was no physical evidence or contemporaneous observations of the alleged sexual abuse, the only evidence of the abuse came from J's delayed disclosure, and the testimony of J's younger sister called J's veracity and motives into question; furthermore, the text messages, if deemed authentic by the jury, could have been used to impeach one of J's statements during her interview and could have been viewed by jurors as evidence of J's motivation to fabricate her allegations against the defendant; accordingly, the case was remanded for a new trial.

Argued June 3—officially released November 19, 2020**

*Procedural History*

Substitute information charging the defendant with four counts of the crime of risk of injury to a child, three counts of the crime of sexual assault in the first degree, and two counts of the crime of sexual assault in the second degree, and with one count each of the crimes of sexual assault in the fourth degree and tampering with a witness, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Bentivegna, J.*; verdict and judgment of guilty of four counts of risk of injury to a child, three counts of sexual assault in the first degree, two counts of sexual assault in the second degree, and one count of sexual assault in the fourth degree, from which the defendant appealed to this court; thereafter, the case was transferred to the Appellate Court, *Alvord, Bright* and *Bear,*

*Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Reversed*; *new trial.*

*Trent A. LaLima*, with whom, on the brief, was *Hubert J. Santos*, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Elizabeth Tanaka*, former assistant state's attorney, for the appellee (state).

*Jennifer B. Smith* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

ROBINSON, C. J. Following a jury trial, the defendant, Manuel T., was convicted of six counts of sexual assault and four counts of risk of injury to a child arising from the sexual abuse of his girlfriend's daughter, J.[1] The defendant now appeals, upon our grant of his petition for certification,[2] from the judgment of the Appellate Court affirming the judgment of conviction. See *State* v. *Manuel T.*, 186 Conn. App. 51, 53, 198 A.3d 648 (2018). On appeal, the defendant claims that the Appellate Court improperly upheld (1) the admission into evidence of a video recording of a forensic interview of J by a nonmedical professional under the medical diagnosis and treatment exception to the hearsay rule, § 8-3 (5) of the Connecticut Code of Evidence, because medical care was not the "primary purpose" of the interview, and (2) the exclusion of screenshot photographs of text messages purportedly sent by J to the defendant's niece on the ground that they had not been sufficiently authenticated. We disagree with the defendant's claim that a primary purpose standard applies to the medical treatment exception. We agree, however, that the Appellate Court incorrectly concluded that the trial court had properly excluded the text messages, and we further conclude that this evidentiary error requires a new trial. Accordingly, we reverse the judgment of the Appellate Court.

The record reveals the following undisputed facts and procedural history. During all relevant times, J lived with the defendant, whom she considered her stepfather,[3] her mother, her younger sister, and her younger brother. J's biological father was mostly absent from her life, in part due to periods of incarceration.

On March 28, 2014, when J was seventeen years old, she reported to her boyfriend, and then her family, and then the police, that the defendant had sexually abused her over the course of many years. In accordance with police protocol, J was referred to the Greater Hartford Children's Advocacy Center (advocacy center) at Saint Francis Hospital and Medical Center for a forensic interview.[4] On April 1, 2014, J participated in that interview, which was conducted by Lisa Murphy-Cipolla, the clinical services coordinator at the advocacy center. Although Murphy-Cipolla interviewed J alone, their conversation was observed through a one-way mirror by Claire Hearn, a police detective, and Audrey Courtney, a pediatric nurse practitioner. Consistent with the standard practice of the advocacy center, the interview was video recorded.

During the interview, J reported that the defendant had sexually abused her over an approximate seven year period, after school and while her mother was at work. She told Murphy-Cipolla that, starting when she was eight or nine years old, the defendant had, on

numerous occasions, touched her inappropriately underneath her clothes. J also disclosed that, when she turned fifteen years old, the defendant had forced her to have vaginal and anal intercourse with him. The defendant subsequently was arrested and charged with six counts of sexual assault and four counts of risk of injury to a child. See footnote 1 of this opinion.

The trial court held a pretrial hearing to determine whether the video recording of the forensic interview would be admissible at trial. As an offer of proof, the state presented the testimony of Murphy-Cipolla and played a partially redacted version[5] of the video recording. Murphy-Cipolla testified regarding her background, the purposes and process of conducting such interviews, and the circumstances of her interview of J. The state argued that the video recording was admissible pursuant to the medical diagnosis and treatment exception to the hearsay rule. See Conn. Code Evid. § 8-3 (5). It noted that, if necessary, it could establish through Hearn's testimony that J had been referred for a medical evaluation after the interview. The defendant objected to the admission of the video recording, arguing that, except for a couple of J's statements, the interview statements did not satisfy the medical treatment hearsay exception because J was not seeking medical diagnosis or treatment in the interview and her statements were not made to a medical professional.

At the conclusion of the hearing, the court rendered an oral decision overruling the defendant's objection. The court concluded that the statements in the interview satisfied the standard for admission under the medical diagnosis and treatment exception, as recently interpreted by the Appellate Court in *State* v. *Griswold*, 160 Conn. App. 528, 127 A.3d 189, cert. denied, 320 Conn. 907, 128 A.3d 952 (2015). That standard required that the purpose of the interview was "in part" to determine whether J needed medical treatment and that her statements were "reasonably pertinent" to achieving that end. See id., 552–53.

Thereafter, the defendant's case proceeded to a jury trial. The state presented J to testify about the abuse and then, over the defendant's renewed objection, also presented the video recording of the forensic interview.

The defendant's theory of the case was that J had fabricated the allegations of abuse. In support of this theory, the defendant sought to introduce two cell phone screenshots depicting text messages purportedly sent by J to V, the defendant's niece, a couple of months before J reported the abuse. On cross-examination, J denied sending any text messages to V.

The court held a hearing outside the presence of the jury to determine the admissibility of the screenshots. As an offer of proof, the defendant conducted a direct examination of V and produced both screenshots. At

the conclusion of the hearing, the court issued an oral decision concluding that the screenshots had not been sufficiently authenticated to be admitted into evidence.

The jury subsequently found the defendant guilty on six counts of sexual assault and four counts of risk of injury to a child. See footnote 1 of this opinion. The court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of forty years incarceration, execution suspended after thirty years, and thirty-five years probation and lifetime sex offender registration.

The defendant appealed from the judgment of conviction to the Appellate Court, contending that the admission into evidence of the forensic interview and the exclusion of the text messages were harmful error.[6] See *State* v. *Manuel T.*, supra, 186 Conn. App. 53. The Appellate Court concluded that neither ruling was an abuse of the trial court's discretion. Id., 64–65, 72. With regard to the interview, the Appellate Court cited the standard it had articulated in *State* v. *Griswold*, supra, 160 Conn. App. 552–57, and other cases, under which "[s]tatements may be reasonably pertinent . . . to obtaining medical diagnosis or treatment *even when that was not the primary purpose of the inquiry that prompted them, or the principal motivation behind their expression.* . . . Although [t]he medical treatment exception to the hearsay rule requires that the statements be both pertinent to treatment and motivated by a desire for treatment . . . in cases involving juveniles, [we] have permitted this requirement to be satisfied inferentially." (Emphasis altered; internal quotation marks omitted.) *State* v. *Manuel T.*, supra, 61. Applying these principles to the present case, the Appellate Court concluded that the trial court had not abused its discretion in admitting the recording of the interview "because it reasonably can be inferred from the circumstances apparent to [J] that she understood the interview had a medical purpose." Id., 63.

With regard to the screenshots of the text messages, the Appellate Court concluded that the trial court had not abused its discretion in excluding them. Id., 65. The Appellate Court determined that V's testimony was insufficient authentication and that there was not sufficient additional corroboration for her testimony. Id., 70–72. Accordingly, the Appellate Court affirmed the judgment of conviction. Id., 72. This certified appeal followed. See footnote 2 of this opinion. Additional facts and procedural history will be set forth as necessary.

On appeal, the defendant contends that the Appellate Court incorrectly concluded that the trial court did not abuse its discretion in admitting the video recorded interview and excluding the text messages. The defendant contends that both rulings rested on the application of improper standards, to the prejudice of the defendant, requiring a new trial. We agree with the

defendant's claim with regard to the text messages and conclude that the trial court's exclusion of this evidence was harmful error.

## I

We begin with the defendant's challenge to the admission of the recording of the forensic interview. The defendant, supported by the amicus curiae, the Connecticut Criminal Defense Lawyers Association, asks this court to adopt a standard under which a minor victim's statements in this type of interview are admissible under the medical treatment exception to the hearsay rule, § 8-3 (5) of the Connecticut Code of Evidence, only if the "primary purpose" in making and eliciting those statements is to obtain and/or provide such treatment. The defendant contends that, because a primary purpose standard applies to the admission of such interviews under the tender years exception to the hearsay rule; see Conn. Code Evid. § 8-10; it is both logical and sound policy to apply the same standard to the medical treatment exception. Specifically, the defendant argues that this court previously indicated that the two exceptions would yield the same result in *State* v. *Maguire*, 310 Conn. 535, 78 A.3d 828 (2013), and, therefore, the same standard should control. The defendant also asserts that the rationale for the medical treatment exception—that such statements are reliable because a person has a strong motivation to be truthful when her health and well-being are at stake—does not apply to an interview involving the police and lacking the confidentiality of the physician-patient relationship. The defendant acknowledges that the Appellate Court squarely rejected this argument in *State* v. *Griswold*, supra, 160 Conn. App. 550, but asks this court to overrule *Griswold*.[7] We are not persuaded that it is necessary or appropriate to limit the medical treatment hearsay exception to statements made for the "primary" purpose of obtaining such treatment.[8]

## A

The record reveals the following additional relevant facts. The forensic interview at issue in this case was conducted in accordance with a statutorily prescribed, multidisciplinary team approach.[9] See General Statutes § 17a-106a. Murphy-Cipolla, who conducted the interview, is not a medical professional; her professional training is in counseling and family therapy. At the commencement of the interview, she identified herself to J as "Lisa," "one of the interviewers" at the "Children's Center . . . ." Although the interview was observed remotely by a police officer and a pediatric nurse practitioner, Murphy-Cipolla informed J only that "a couple of ladies . . . I work with" could see them through a one-way mirror in the room. Murphy-Cipolla also informed J that the interview was being recorded, explaining that this procedure would avoid J having to repeat her account. Murphy-Cipolla took some back-

ground information and then asked J what she had come to talk about, to which J replied: "My stepdad . . . molested me when I was [eight years old] until last year, and I just never said anything, and I just said something [four days ago]." J thereafter described the defendant's sexual abuse. Murphy-Cipolla pressed for details when J's account regarding the abuse was vague and inquired about certain matters that J did not offer, which prompted J to disclose, among other things, the location where particular incidents took place, whether anyone else was present in the house when these incidents occurred, and which brand of condom the defendant had used. J mentioned experiencing physical pain during the incidents of anal intercourse, expressed concern that she could have contracted a sexually transmitted disease, and explained how the abuse and her reporting of it had affected her state of mind. Following the interview, J was offered a medical examination,[10] which she declined, she was given a pregnancy test and a test for sexually transmitted diseases, both of which were negative, and she was referred for counseling.

B

Section 8-3 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . (5) A statement made for purposes of obtaining a medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical diagnosis or treatment. . . ." This rule sets forth, in effect, a two-pronged test. The first addresses the declarant's purpose or motivation in the making of the statement, and the second addresses the pertinence of the statement to that end.[11] See *State* v. *Dollinger*, 20 Conn. App. 530, 535, 568 A.2d 1058 ("[t]he medical treatment exception to the hearsay rule requires that the statements be *both* pertinent to treatment and motivated by a desire for treatment" (emphasis added)), cert. denied, 215 Conn. 805, 574 A.2d 220 (1990).

We emphasize at the outset that, although at oral argument before this court, the defendant's appellate counsel pointed to a few statements in the interview that he contends have no relevance to medical treatment (e.g., reporting the brand of condoms used by the defendant) and conceded that a few others would be pertinent to such treatment, the defendant's certified appeal does not challenge the admission of particular statements for lack of pertinence to medical treatment. The defendant's claim on appeal is that the entire interview should have been excluded under the purpose prong because we should construe this hearsay exception to require that the interview's primary purpose was to obtain and/or provide medical treatment or diagno-

sis.

Our analysis begins with the observation that, although many other jurisdictions have adopted a similarly phrased two-pronged medical treatment hearsay exception; see, e.g., Fed. R. Evid. 803 (4); Ind. R. Evid. 803 (4); Ky. R. Evid. 803 (4); Mich. R. Evid. 803 (4); N.M. R. Evid. 11-803 (4); N.C. R. Evid. 803 (4); Ohio R. Evid. 803 (4); neither the defendant nor the amicus has identified a single jurisdiction that has applied a primary medical purpose standard to this exception generally or to its application in this type of interview of minor victims specifically.[12] Our independent research has revealed none.

One sister state jurisdiction has provided cogent reasons for rejecting the application of a primary purpose standard in a case that, like this one, involved a challenge to the admissibility of an interview of a minor sexual assault victim. The New Mexico Supreme Court first recognized that "[t]he 'primary purpose of the encounter' approach . . . is derived from the United States Supreme Court's [c]onfrontation [c]lause jurisprudence." *State* v. *Mendez*, 148 N.M. 761, 769, 242 P.3d 328 (2010). Under *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the hearsay statements of an unavailable witness that are "testimonial" in nature may be admitted under the sixth amendment's confrontation clause only if the defendant has had a prior opportunity to cross-examine the declarant. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the *primary purpose* of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (Emphasis added.) *Davis* v. *Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

The New Mexico Supreme Court then explained: "The hearsay rule and the [c]onfrontation [c]lause are not [coextensive] and must remain distinct. The hearsay rule is intended to ensure that the jury is not exposed to unreliable evidence, even when the declarant testifies at trial and is subject to [cross-examination]. The [c]onfrontation [c]lause guarantees the accused in a criminal trial the right to be confronted with the witnesses against him, regardless of how trustworthy the out-of-court statement may appear to be. [See U.S. Const., amend. VI.] More important for present purposes, the unique dangers each seeks to avoid can be implicated under quite distinct circumstances. As the United States Supreme Court explained in *Crawford*, not all hearsay implicates the [s]ixth [a]mendment's core concerns. An off-hand, overheard remark might be unreliable evi-

dence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the [civil law] abuses the [c]onfrontation [c]lause targeted. On the other hand, ex parte examinations might sometimes be admissible under modern hearsay rules, but the [f]ramers certainly would not have condoned them." (Internal quotation marks omitted.) *State* v. *Mendez*, supra, 148 N.M. 769.

"In *Crawford*, the United States Supreme Court listed several examples of the core class of testimonial statements which trigger [c]onfrontation [c]lause concerns . . . ." (Internal quotation marks omitted.) Id. "What these examples have in common is that they lend themselves to an analysis that focuses largely on surrounding circumstances to separate testimonial from [nontestimonial] statements.

"For example, once an individual prepares an affidavit, the reliability of any single statement is largely irrelevant for constitutional purposes because it will *all* be testimonial and inadmissible under the [s]ixth [a]mendment without a prior opportunity for cross-examination. The act of preparing an affidavit evinces the preparer's awareness that each statement could be used at trial." (Footnote omitted.) Id., 770.

"Unlike the [c]onfrontation [c]lause context, in which the surrounding circumstances determine whether the declarant is bearing testimony, the medical or nonmedical purpose of a statement cannot be determined without closely examining the *substance* of the statement. Surrounding circumstances are certainly relevant, but the focus must center on the individual statement." (Emphasis in original; internal quotation marks omitted.) Id.

"The diversion created by [applying a primary medical purpose test to the medical treatment hearsay exception] is that it directs courts to determine the purpose of the encounter, *instead of considering the substance of, and circumstances surrounding, individual statements*. This approach is irreconcilable with previous hearsay opinions in which . . . courts have focused on particular statements, determining in each instance the purpose for which the statement was made." (Emphasis added.) Id., 772.

We agree with the reasoning of the New Mexico Supreme Court in *Mendez*. We disagree with the defendant's argument that our decision in *State* v. *Maguire*, supra, 310 Conn. 535, dictates otherwise. In *Maguire*, this court considered whether the trial court properly admitted the child sexual abuse victim's statements adduced in a forensic interview under the tender years exception to the hearsay rule without making certain findings mandated by law, including that the interview had not been conducted "in preparation of a legal proceeding." Id., 563, citing General Statutes § 54-86*l* (a)

and Conn. Code Evid. (2009) § 8-10 (a).[13] We rejected the state's contention that this court had previously determined that forensic interviews like the one at issue were admissible as a matter of law and, thus, that such a finding was unnecessary. *State* v. *Maguire*, supra, 563–64. We noted that the tender years hearsay exception must be applied "consistently with the sixth amendment bar against testimonial hearsay, as explained in *Crawford* [v. *Washington*, supra, 541 U.S. 68–69]. . . . The prohibition of the tender years exception against statements made in preparation of a legal proceeding is simply another way of saying that, to be admissible, the statement must be nontestimonial for purposes of *Crawford*." (Citation omitted.) *State* v. *Maguire*, supra, 564–65. We explained in *Maguire* that this court had determined in the prior case relied on by the state that the forensic interview of the child sexual assault victim had met "the fact intensive 'primary purpose' test articulated in *Davis* v. *Washington*, [supra, 547 U.S. 822]." *State* v. *Maguire*, supra, 566. We clarified that statements in such interviews are not per se nontestimonial, and, instead, "a victim's statements during a forensic interview may be deemed nontestimonial only if the *essential* purpose of the interview is to provide medical assistance to the victim." (Emphasis added.) Id., 569.

The court in *Maguire* then noted in dictum: "Indeed, statements made in the course of a forensic interview that satisfy the criteria for admission under the tender years exception *are similar to statements made to a physician in the course of medical treatment, which are admissible under the medical treatment and diagnosis exception to the hearsay rule*, including statements that reveal the identity of the abuser." (Emphasis added.) Id. This statement has spawned some confusion in our trial courts.

Our Appellate Court correctly recognized in *Griswold* that this statement in *Maguire* was not intended to suggest equivalence between the two hearsay exceptions when considering whether either exception supported the trial court's admission of statements made by child sex abuse victims in forensic interviews. In *Griswold*, the Appellate Court first concluded that the trial court improperly had admitted video recordings of forensic interviews under the tender years exception, as interpreted in *Maguire*, because "the circumstances surrounding the victims' forensic interviews objectively demonstrate[d] that their primary purpose was not to provide the victims with medical diagnosis or treatment, but to [establish] or prov[e] past events potentially relevant to later criminal prosecution." (Internal quotation marks omitted.) *State* v. *Griswold*, supra, 160 Conn. App. 547.

The Appellate Court rejected the defendant's claim, however, that *Maguire* necessarily compelled the conclusion that the trial court also improperly admitted

the videos under the medical diagnosis and treatment exception. It began its analysis by underscoring that, "because the victims appeared at trial and were subject to cross-examination by the defendant, *Crawford* and its progeny [did] not apply *directly* to the . . . case." (Emphasis in original.) Id., 550–51. It then reasoned that, because "hearsay that does not fall into one exception to the hearsay rule may still be admissible if it falls within another exception . . . the question of whether the videos and their written summaries [were] admissible under the medical diagnosis and treatment exception require[d] its own analysis independent of the one undertaken pursuant to the tender years exception. Indeed, the Code of Evidence specifically states in the tender years exception that [n]othing in this section shall be construed to . . . prevent the admission of any statement under another hearsay exception. Conn. Code Evid. § 8-10 (b) (1)." (Citation omitted; internal quotation marks omitted.) *State* v. *Griswold*, supra, 160 Conn. App. 551–52. The Appellate Court further explained that, "[i]n the context of a forensic interview, [the medical diagnosis and treatment] standard is substantially less demanding than the one imposed by *Crawford* and incorporated into the tender years exception." Id., 552. In light of these factors, the Appellate Court "decline[d] to construe the court's observation [in *Maguire*] as suggesting that, because some statements *admissible* under both hearsay exceptions are similar in nature, other statements *inadmissible* under one exception are necessarily inadmissible under the other." (Emphasis in original.) Id., 554.

The Appellate Court in *Griswold* did note, however, the following concern: "[B]ecause the standard for admission of forensic interview evidence under the medical diagnosis and treatment exception is less stringent than the standard for admission under the tender years exception, the state in future cases may rely solely on the medical diagnosis and treatment exception, thereby effectively rendering *Maguire* a nullity. This potential anomaly, however, is not for [the Appellate] [C]ourt to address but, instead, is best left for consideration by [the] Supreme Court, either in its adjudicative function or as overseer of the Code of Evidence." Id., 557–58.

We take this opportunity to clarify that, in the context of this type of interview of a minor sexual assault victim, the tender years hearsay exception and the medical treatment exception may substantially overlap in application but nevertheless may also occupy different fields of operation. The tender years exception is not limited to statements that reasonably pertain to "medical diagnosis or treatment" but includes any statement "relating to" a sexual offense committed against that child or an offense involving physical abuse committed against that child by certain persons. As the Appellate Court observed in the present case, the tender years exception

considers the purpose of the interview, whereas the medical treatment exception focuses on the declarant's purpose in making individual statements. See *State* v. *Manuel T.*, supra, 186 Conn. App. 62 ("[b]ecause the focus of the medical treatment exception is the declarant's understanding of the purpose of the interview, the inquiry must be restricted to the circumstances that could be perceived by the declarant, as opposed to the motivations and intentions of the interviewer that were not apparent to the declarant"). The mere fact that the state may rely on the medical treatment exception rather than the tender years exception to avoid the more restrictive primary purpose test is not in itself a sound reason to engraft the latter's constitutionally derived primary purpose standard onto the former.

The defendant's concern, at bottom, appears to be one of reliability. See, e.g., *State* v. *Cruz*, 260 Conn. 1, 7, 792 A.2d 823 (2002) ("[t]he rationale underlying the medical treatment exception to the hearsay rule is that the patient's desire to recover his health . . . will restrain him from giving inaccurate statements to a [health care professional] employed to advise or treat him" (internal quotation marks omitted)). We are not persuaded that the proper application of the existing medical treatment hearsay exception does not ensure the reliability of the statements made at a forensic interview. There is a legitimate question as to J's motivation in participating in the interview in the present case and whether all of her statements were reasonably pertinent to medical treatment or diagnosis. The trial court plainly did not assess the admissibility of the statements in the forensic interview individually but in toto. This approach may have been a reflection of the position taken by the parties, both of whom seemed to take an "all or nothing" view of interviews of minor sexual assault victims. Because we conclude in part II of this opinion that the defendant is entitled to a new trial, he will have the opportunity to make specific objections to individual statements should he so choose.[14]

II

We next turn to the defendant's claim that the Appellate Court incorrectly concluded that the trial court did not abuse its discretion in excluding the screenshots of two text messages purportedly authored by J for lack of authentication. The defendant contends that, although the traditional authentication standard was met in the present case, the trial court and, in turn, the Appellate Court improperly applied a heightened standard for the authentication of the electronic communication. He further contends that the exclusion of this evidence was harmful because it would have supported his defense that J fabricated the claims of abuse because she was upset with the defendant for, among other things, failing to buy her a car. We agree.

A

The record reveals the following additional undisputed facts and procedural history. When the defendant cross-examined J during the state's case-in-chief, she denied that she had ever sent text messages to V and specifically denied sending the messages reflected in the defendant's two exhibits. To authenticate the two screenshots taken of the messages, in his rebuttal case, the defendant made an offer of proof through direct examination of V and production of the screenshots.

Outside the presence of the jury, V offered the following testimony. V and J are approximately the same age. They had known each other since they were children and were close during their younger years, but had drifted apart more recently. Sometime in February or early March, 2014, V decided to reach out to J by way of text message. J had given her phone number to V at a previous family function, and V saved it in her telephone contacts under J's name.

In her initial message, V greeted J by name. V received replies, which she believed to be from J because the messages came from the number J had given V, they referred to J's family members by name, and the author of the reply messages expressed herself in a manner as J previously had.

Later, V took screenshots of two of the text messages she received in reply to that exchange. She attested that the screenshots accurately reflected the text messages on her telephone. V was unable to capture the full exchange in her screenshots because the texts were too long. She attested, however, that the text messages in the two screenshots were part of the same conversation.

By the time of trial, V had replaced the cell phone on which she had received these text messages and could not produce that cell phone. V also had been unable to produce telephone records to demonstrate when the text conversation had occurred between these telephone numbers because her mobile service provider no longer retained records for the February–March, 2014 period.

The first screenshot, which did not fully capture the contact's name, contains a small portion of a message from one party and the following reply: "I didn't forget lol and yes he got himself a new car in a week [and] then sold it for another car in less than a day but when it comes to me he can't get one. Smh[15] his excuse is I don't deserve one cus of my attitude. He broke his promise to me about getting me [one] that's why I don't talk to him anymore he doesn't deserve my kindness I'm sick and tired of BROKEN promises!

"But it is what it is. I'll just buy my own damn car since I buy everything else myself. But what's new with you? Why you all of a sudden hit me up. Lol." (Footnote added.)

The second screenshot revealed the contact to be someone with the same first name as J. The screenshot cut off the top of the message, which continued:[16] "I turn 18 this year . . . I should be happy but I'm scared. And [m]y job is so stressful. This year hasn't been good for me at all it's always something everyday nothing good happens to me anymore the ONLY [thing] going good right now is my relationship with [T][17] and my bf.[18] That's it. And same my dad keeps breaking his promises along with my step dad well [M]anny.[19] We don't even talk anymore it's like neither of my fathers are there for me . . . so my mom is all I got. It really hurts to say it but it is what it is.

"And on top of this I've been looking for another job and saving up for a car cus [M]anny is selfish and won't buy me one." (Footnotes added.)

The trial court sustained the state's objection to the admission of the screenshots on the ground that they had not been sufficiently authenticated. The court determined that the defendant had failed to make a prima facie case that J authored the text messages exhibited by the screenshots because the messages were not the complete exchange between the parties, lacked temporal indicators of date and time, and were devoid of distinctive characteristics that would identify J as the author.

In its decision affirming the trial court's judgment, the Appellate Court relied on a recent line of its cases beginning with *State* v. *Eleck*, 130 Conn. App. 632, 23 A.3d 818 (2011), aff'd, 314 Conn. 123, 100 A.3d 817 (2014); *State* v. *Manuel T.*, supra, 186 Conn. App. 69–70; which it characterized as its "seminal decision on the authentication of electronic evidence." Id., 69. The court acknowledged that, "[a]mong the examples of methods of authenticating evidence set forth in the official commentary to § 9-1 (a) of the [Connecticut] Code of Evidence is that [a] witness with personal knowledge may testify that the offered evidence is what its proponent claims it to be, and [t]he distinctive characteristics of an object, writing or other communication, when considered in conjunction with the surrounding circumstances, may provide sufficient circumstantial evidence of authenticity." (Internal quotation marks omitted.) Id., 68. It suggested that, although the traditional methods of authentication applied to electronic communications, a more stringent standard of proof would apply because "an electronic communication, such as a Facebook message, an e-mail or a cell phone text message, could be generated by someone other than the named sender . . . ." (Internal quotation marks omitted.) Id. The Appellate Court concluded that the trial court did not abuse its discretion in determining that this standard had not been met in the present case because the screenshots did not capture the complete communication between the parties, there was no proof of the date

on which the communication occurred, there were no distinguishing features in the text that would identify J as the author, and J had denied sending the messages. Id., 69–72.

B

The defendant advances two reasons why the Appellate Court incorrectly determined that the trial court did not abuse its discretion in excluding the screenshots: first, the Appellate Court and the trial court improperly applied a heightened standard of authentication and, second, the screenshots met the proper authentication standard. Although the parties analyze this question under the abuse of discretion standard, for the reasons set forth hereinafter, we conclude that it is more properly analyzed as a legal question subject to plenary review.[20] See, e.g., *Hartford* v. *CBV Parking Hartford, LLC*, 330 Conn. 200, 214, 192 A.3d 406 (2018) ("[w]hether the trial court applied the proper legal standard is subject to plenary review on appeal"); *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007) ("To the extent a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." (Citations omitted.)). Under the proper, universally applicable standard, the trial court incorrectly determined that the defendant had not met his burden of authenticating this evidence.

"Authentication . . . is viewed as a subset of relevancy, because evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which its proponent claims." (Internal quotation marks omitted.) *Lorraine* v. *Markel American Ins. Co.*, 241 F.R.D. 534, 539 (D. Md. 2007). Our Code of Evidence provides that "[t]he requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a). "[A] writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Garcia*, 299 Conn. 39, 57, 7 A.3d 355 (2010).

"Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity." (Internal quotation marks omitted.) Id., 57–58. "[C]ompliance with [§] 9-1 (a) does not automatically guarantee

that the fact finder will accept the proffered evidence as genuine." Conn. Code Evid. § 9-1, commentary.

It is widely recognized that a prima facie showing of authenticity is a low burden.[21] See *United States* v. *Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) (standard "is not a burdensome one" (internal quotation marks omitted)), cert. denied sub nom. *Hall* v. *United States*, U.S. , 137 S. Ct. 691, 196 L. Ed. 2d 570 (2017); *United States* v. *Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004) ("minimal standards for authentication"); *Lorraine* v. *Markel American Ins. Co.*, supra, 241 F.R.D. 545 (recognizing "the proponent's light burden of proof in authenticating an exhibit" (internal quotation marks omitted)); *Gagliardi* v. *Commissioner of Children & Families*, 155 Conn. App. 610, 619, 110 A.3d 512 (bar for authentication of evidence is not particularly high), cert. denied, 316 Conn. 917, 113 A.3d 70 (2015); *State* v. *Mrza*, 302 Neb. 931, 938, 926 N.W.2d 79 (2019) ("[the] rule does not impose a high hurdle for authentication"). This is because "[a] proponent of evidence is not required to *conclusively prove the genuineness* of the evidence *or to rule out all possibilities inconsistent with authenticity*." (Emphasis added.) *State* v. *Mrza*, supra, 938; accord *Campbell* v. *State*, 382 S.W.3d 545, 549 (Tex. App. 2012); see also *State* v. *Valentine*, 255 Conn. 61, 77, 762 A.2d 1278 (2000) ("[t]he proffering party must demonstrate to the trial court that there is substantial evidence from which the jury *could* infer that the telephone communication was authentic" (emphasis added)).

The commentary to our rule of evidence makes clear that electronic communications, such as text messages, are subject to the same standard of authentication and the same methods of authentication as other forms of evidence: "As with any other form of evidence, a party may use any appropriate method, or combination of methods, described in this commentary, or any other proof to demonstrate that the proffer is what its proponent claims it to be, to authenticate any particular item of electronically stored information." Conn. Code Evid. (2018) § 9-1, commentary; cf. *State* v. *Hannah*, 448 N.J. Super. 78, 88–89, 151 A.3d 99 (App. Div. 2016) ("Despite the seeming novelty of social [network generated] documents, courts have applied the existing concepts of authentication . . . . We need not create a new test for social media postings." (Citations omitted; internal quotation marks omitted.)).

One such appropriate method of authentication identified in the commentary to our rule, and broadly recognized in other jurisdictions, is that "[a] witness with personal knowledge may testify that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1, commentary. This is precisely what V's testimony accomplished. V testified: she and J had been close while they were growing up; J provided her

phone number to V at a family function; V entered the number in her phone contacts; a couple of months before J reported the abuse, V initiated a text message to that number in which she greeted J by name; V received replies; V believed the replies to be from J because of their substance and manner of expression; and the screenshots accurately reflected the text messages V received.

The commentary to the code also provides that "[t]he distinctive characteristics of an object, writing or other communication, when considered in conjunction with the surrounding circumstances, may provide sufficient circumstantial evidence of authenticity." Conn. Code Evid. § 9-1, commentary. Although the contents of the text messages do not reveal facts known only to J, they are consistent with having been sent by her. They refer to her age, her job, her family members, her boyfriend, and her biological father's absence, and imply that she had not heard from V in some time, which was consistent with V's testimony. [22]

Although the Appellate Court recited the aforementioned legal principles, it is apparent that neither that court nor the trial court held the defendant to the low burden of establishing a prima facie case of authenticity and, instead, effectively required the defendant to establish that the text messages were in fact what they purported to be. Specifically, the trial court and the Appellate Court deemed the testimony of V insufficient authentication. They pointed to information missing from the screenshots or not provided through corroborative evidence, such as the date of the communication. This conclusion, however, is inconsistent with numerous federal and sister state decisions that have held that comparable testimony sufficiently authenticated text messages or similar electronic communication. See, e.g., *United States* v. *Arnold*, 696 Fed. Appx. 903, 907 (10th Cir. 2017) (rejecting argument that text messages copied into separate document were not sufficiently authenticated because they "contained insufficient distinctive identifiers—e.g., dates, phone numbers, and customary text message format"—when proffering party presented witness who testified that he had received original text messages from defendant and testified "as to the general time frame and the order of events that occurred when he received particular messages and groups of messages"); *United States* v. *Ramirez*, 658 Fed. Appx. 949, 952 (11th Cir. 2016) (screenshots of text messages were properly authenticated when party to exchange testified that photographs of messages were from her phone and identified text messages sent between her and purported author, there was testimony that screenshots fairly and accurately represented text messages, and there was evidence that purported author was user of other phone number); *United States* v. *Lanzon*, 639 F.3d 1293, 1300–1301 (11th Cir.) (instant messages transferred to Microsoft Word document were properly

authenticated by witness who testified that he participated in online chats and that transcripts were accurate copies of those conversations), cert. denied, 565 U.S. 916, 132 S. Ct. 333, 181 L. Ed. 2d 208 (2011); *Pierce* v. *State*, 302 Ga. 389, 395–96, 807 S.E.2d 425 (2017) (screenshots of text messages on cell phone were properly authenticated, despite facts that proffering party did not introduce cell phone records, that purported author denied sending messages, and that no one testified that they observed him send them, when there was testimony that images were fair and accurate representation of what appeared on cell phone screen and cell phone owner testified that phone number shown for text messages he received was author's phone number and that he exchanged several text messages with author); *People* v. *Ziemba*, 100 N.E.3d 635, 648 (Ill. App. 2018) (finding that text messages were authenticated by "the undercover officer who personally sent and received the text messages"); *State* v. *Tieman*, 207 A.3d 618, 622 (Me. 2019) (Facebook Messenger conversation was authenticated through testimony of person with whom victim was communicating); *State* v. *Roseberry*, 197 Ohio App. 3d 256, 270, 967 N.E.2d 233 (2011) ("in most cases involving . . . texts, instant messaging, and e-mails, the photographs taken of the print media or the printouts of those conversations are authenticated, introduced, and received into evidence through the testimony of the recipient of the messages"); *Commonwealth* v. *Davis*, Docket No. 1055 MDA 2018, 2019 WL 2323815, *5 (Pa. Super. May 31, 2019) (deeming text message authenticated because "there was first-hand corroborating testimony from . . . [the] recipient" (internal quotation marks omitted)), appeal denied, 222 A.3d 1125 (Pa. 2020); *Commonwealth* v. *Danzey*, 210 A.3d 333, 338 (Pa. Super.) ("the proponent of social media evidence must present direct or circumstantial evidence that tends to corroborate the identity of the author of the communication in question, such as testimony from the person who sent or received the communication, or contextual clues in the communication tending to reveal the identity of the sender" (internal quotation marks omitted)), appeal denied, 219 A.3d 597 (Pa. 2019); *Hasan* v. *Board of Medicine*, 242 W. Va. 283, 295, 835 S.E.2d 147 (2019) (concluding that testimony from recipient of text messages that they accurately reflected ones that she had received from purported author was "sufficient to authenticate the text messages" but noting "that there was additional evidence showing distinctive characteristics that link [the parties] to the text messages").

The trial court and the Appellate Court also mistakenly relied on the fact that the screenshots did not capture the complete communication. The rule of completeness is a different rule of evidence; see Conn. Code Evid. § 1-5; that serves different concerns from those of authentication. See *United States* v. *Arnold*, supra,

696 Fed. Appx. 906–907 (rejecting argument that government failed to properly authenticate exhibit reflecting screenshots of text messages because recipient testified that he was not sure whether printed exhibit included all messages exchanged between parties when government never represented at trial that exhibit contained all text messages between parties, and, accordingly, government properly authenticated exhibit "as a document that displayed . . . [screenshots] of the text messages" saved on cell phone); *State* v. *Mrza*, supra, 302 Neb. 939 (noting that defendant's argument improperly "attempts to invoke the rule of completeness under the rubric of authenticity" and that "[t]he rule of authentication did not require the [s]tate to offer all of the Snapchat messages in evidence" (footnote omitted)); *Commonwealth* v. *Hart*, Docket No. 3284 EDA 2016, 2018 WL 2307381, *9 (Pa. Super. May 22, 2018) (resolving authentication issue before turning to completeness claim). Moreover, the present case does not implicate the concern underlying the rule of completeness, because there is no contention that other relevant parts of the text messages exist that would provide a different context for the portion of the messages offered. See, e.g., *State* v. *Jackson*, 257 Conn. 198, 213, 777 A.2d 591 (2001) ("[W]hen one party to a litigation or prosecution seeks to introduce admissions that constitute only a portion of a conversation, the opposing party may introduce other relevant portions of the conversation, irrespective of whether they are self-serving or hearsay. . . . The purpose of this rule is to ensure that statements placed in evidence are not taken out of context." (Citations omitted; internal quotation marks omitted.)). Rather, J simply asserted that she had not sent the messages at issue.

It appears that the trial court and the Appellate Court held the defendant to a higher standard than a prima facie case because the evidence was an electronic communication. The Appellate Court cited its prior cases in expressing the concern that "an electronic communication, such as a Facebook message, an e-mail or a cell phone text message, could be generated by someone other than the named sender . . . ." (Internal quotation marks omitted.) *State* v. *Manuel T.*, supra, 186 Conn. App. 68. Similar concerns, however, may arise even with more traditional forms of communication. In a federal case cited favorably in the commentary to our rule, the court addressed this issue: "The argument is that e-mails or text messages are inherently unreliable because of their relative anonymity and the fact that while an electronic message can be traced to a particular computer, it can rarely be connected to a specific author with any certainty. Unless the purported author is actually witnessed sending the e-mail, there is always the possibility it is not from whom it claims. . . . [A]nybody with the right password can gain access to another's e-mail account and send a message ostensibly from

that person. However, the same uncertainties exist with traditional written documents. A signature can be forged; a letter can be typed on another's typewriter; distinct letterhead station[ery] can be copied or stolen. . . . We see no justification for constructing unique rules of admissibility of electronic communications such as instant messages; they are to be evaluated on a case-by-case basis as any other document to determine whether . . . there has been an adequate foundational showing of their relevance and authenticity."[23] (Internal quotation marks omitted.) *Lorraine* v. *Markel American Ins. Co.*, supra, 241 F.R.D. 543; see Conn. Code Evid. (2018) § 9-1, commentary. As another court correctly observed, "[q]uestions about the integrity of electronic data generally go to the *weight* of electronically based evidence, *not its admissibility*."[24] (Emphasis added; internal quotation marks omitted.) *State* v. *Tieman*, supra, 207 A.3d 622.

In the present case, the defendant clearly established a prima face case of authentication through V's testimony. Whatever doubts might exist as to V's credibility or as to the reliability of the source of the messages go to the weight, not the admissibility, of the text messages. Therefore, the Appellate Court incorrectly determined that the trial court properly excluded the text messages.

### C

The question that remains is whether the improper exclusion of the text messages requires reversal of the judgment and a new trial. The state argues that the exclusion of this evidence was harmless error. We conclude, however, that the defendant has met his burden of proving harmful error, which requires reversal of the judgment.

"[A] nonconstitutional [evidentiary] error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Sinclair*, 332 Conn. 204, 233, 210 A.3d 509 (2019). "[W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the [defendant's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) Id.

The following factors deprive us of this assurance. The state does not contend that it had a particularly strong case, and it is clear that it did not. The only evidence of the sexual abuse came from J's delayed

disclosure. There was no physical evidence of the abuse or contemporaneous observations of other witnesses that would tend to corroborate J's account. Testimony from J's younger sister, the defendant's biological daughter, called J's veracity and motives into question.

The defendant's theory of the case was that J had fabricated the claims of abuse because she wanted to move in with her boyfriend—something that she admitted the defendant would not have allowed and that occurred not long after the defendant was removed from the home following J's disclosure—and because she was angry with him for, among other things, not having bought her a car. The text messages, if deemed authentic by the jury, could have been seen by a juror as powerful evidence of one of those motivations. The evidence also could have been used to impeach J's statement in her interview that, in December, 2013, a few months before she disclosed the abuse, the defendant offered to buy her a car if she agreed to have sex with him. J said in the interview that she had refused the defendant's offer and told him that she would prefer to buy her own car.

Although J's younger sister testified that J had complained on more than one occasion about the defendant's failure to buy her a car, we are not persuaded that this fact renders the excluded evidence cumulative. The text messages, if authentic, were J's own words. Those words could be understood to express hurt feelings and anger that are not equally conveyed by her sister's secondhand account of J's complaints.

We are not persuaded by the state's arguments that the exclusion of this evidence did not affect the verdict. In addition to the sister's testimony, the state points to the fact that defense counsel's closing argument referred to J's anger at the defendant for failing to purchase a car for her. But counsel's argument is not evidence, and the trial court informed the jury of this well settled principle before closing arguments commenced. See, e.g., *State* v. *Ancona*, 270 Conn. 568, 609, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005). The state also points to the fact that J stated unequivocally in her forensic interview that she did not like the defendant. In the absence of the text messages, however, the jury was more likely to conclude that her dislike was a natural consequence of the abuse that the defendant had inflicted on her.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to that court for a new trial.

In this opinion the other justices concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be

ascertained. See General Statutes § 54-86e.

** November 19, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant was convicted of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), one count of sexual assault in the first degree in violation of § 53a-70 (a) (2), two counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (E), and four counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). The defendant also was charged with one count of tampering with a witness in violation of General Statutes § 53a-151. After the jury was unable to reach a verdict on that count, the state entered a nolle prosequi as to that count.

[2] We granted the defendant's petition for certification to appeal to this court, limited to the following issues: (1) "Did the Appellate Court apply the proper standard in determining that, in a criminal prosecution for sexual abuse of a child, hearsay statements made during a forensic interview of the child complainant are admissible under § 8-3 (5) of the Connecticut Code of Evidence?" And (2) "Did the Appellate Court properly conclude that the trial court did not abuse its discretion by excluding from evidence certain screenshots of text messages?" *State* v. *Manuel T.*, 330 Conn. 968, 200 A.3d 189 (2019).

[3] J referred to the defendant as her stepfather, but also as her mother's boyfriend. Because the defendant also refers to himself as her stepfather, and his legal relationship to J is not relevant to any legal issue in the case, for convenience, we treat his status as J's stepfather.

[4] Although the Appellate Court referred to the advocacy center's interview as a "diagnostic" interview; *State* v. *Manuel T.*, supra, 186 Conn. App. 54; as did the state and the advocacy center's interviewer in her testimony at trial, the statutory scheme designates it as a "forensic" interview. General Statutes § 17a-106a (e). Therefore, we use the statutory term, as we have done in other cases. See, e.g., *State* v. *Maguire*, 310 Conn. 535, 538, 78 A.3d 828 (2013).

[5] The state voluntarily redacted, with the approval of the defendant and the trial court, certain statements, including ones that implicated the rape shield law, General Statutes § 54-86f, and others that were deemed irrelevant.

[6] The defendant initially appealed to this court, and we transferred the appeal to the Appellate Court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[7] Although the state argues that *Griswold* properly was applied by the courts below, its threshold position is that this court should not consider the defendant's claim that a "primary purpose" standard should have been applied because (1) he did not seek application of this standard in the trial court, and (2) as a consequence, the record lacks the necessary findings as to the primary purpose of the interview. The defendant disputes both contentions.

We conclude that it is proper to address the defendant's primary purpose claim, irrespective of any potential preservation concerns or deficiencies in the record. In light of our conclusion in part II of this opinion that the defendant is entitled to a new trial due to the improper exclusion of the text messages, we would address the proper standard for admission of this evidence even if the issue was unpreserved, as it would be likely to arise on remand. See, e.g., *State* v. *Lebrick*, 334 Conn. 492, 521 n.16, 223 A.3d 333 (2020); *In re Taijha H.-B.*, 333 Conn. 297, 312 n.9, 216 A.3d 601 (2019). The proper standard for admission of the evidence is purely a question of law, to which we apply plenary review. See *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007) (proper interpretation of rules of evidence is subject to plenary review); see also *State* v. *Mendez*, 148 N.M. 761, 766, 242 P.3d 328 (2010) (whether primary purpose of interview controls admissibility of all statements made during diagnostic interview under medical treatment hearsay exception is subject to de novo review).

[8] This court previously has held that it has the authority to modify the Connecticut Code of Evidence. See *State* v. *DeJesus*, 288 Conn. 418, 454–62, 953 A.2d 45 (2008) (holding that this court has authority to modify common-law rules of evidence codified in code).

[9] Forensic interviews of child sexual assault victims are designed, by law, to serve dual functions: to investigate child abuse and to treat victims of such abuse. See General Statutes §§ 17a-101, 17a-101h and 17a-106a. By conducting and recording an interview that is available to a multidisciplinary team comprised of law enforcement, medical and mental health profession-

als, and the Department of Children and Families, the law aims to minimize further trauma to the victim. See General Statutes §§ 17a-101 and 17a-101h.

[10] It is the advocacy center's standard practice to offer a medical examination following these interviews.

[11] In sexual assault cases, this court has held that "testimony pertaining to the identity of the defendant and the nature of the sexual assault [are] . . . pertinent to proper diagnosis and treatment of the resulting physical and psychological injuries of sexual assault." *State* v. *Kelly*, 256 Conn. 23, 45, 770 A.2d 908 (2001); see also *State* v. *Wood*, 208 Conn. 125, 133–34, 545 A.2d 1026 ("medical" encompasses psychological as well as somatic illnesses and conditions), cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988). Statements made by a sexual assault complainant to someone other than a treating physician or mental health care provider may satisfy this exception if the person receiving that account is found to have been "acting within the chain of medical care" and the other requirements of the exception are met. *State* v. *Cruz*, 260 Conn. 1, 6, 792 A.2d 823 (2002); see id. (statements to social worker were admissible).

[12] The amicus brief cites cases from other jurisdictions in which courts have (a) characterized a victim's statements about the defendant's abuse as lacking a medical purpose or motive under the circumstances, (b) effectively determined that, if the child victim was too young to be unaware that his statements would enable a physician to make a diagnosis and provide treatment and thus would not understand the need to speak truthfully, the statements would be inadmissible under the medical treatment exception, and (c) deemed statements identifying the defendant as the abuser inadmissible under this exception.

Although some of this case law relates to the proper *application* of the medical purpose prong of the exception, none is relevant to the specific issue in this certified appeal, namely, whether the victim must have the *primary* purpose of obtaining medical treatment or diagnosis. In the cases falling under (a), the courts determined that there was *no* medical purpose. If the defendant in the present case, on remand, is able to establish that the victim was not motivated by such a purpose even in part, her statements would be inadmissible under our law as it currently exists.

The cases falling under (b) and (c) are no doubt in tension with our state's appellate case law, which has declined to take a strict view of the medical treatment exception. See, e.g., *State* v. *Kelly*, 256 Conn. 23, 45, 770 A.2d 908 (2001). Appellate Court case law has allowed the purpose prong to be satisfied inferentially in cases involving juveniles, even if the victim was too young to have the conscious purpose of obtaining medical treatment to advance her own health. See *State* v. *Dollinger*, supra, 20 Conn. App. 536. This court has held that the abuser's identity is pertinent to medical treatment and diagnosis. See *State* v. *Kelly*, supra, 45. Neither of the issues in (b) or (c) is relevant to the issue in this certified appeal. Moreover, the vitality of case law addressing children too young to form a conscious intent of obtaining medical treatment and to understand the need for truthfulness would have no application to the present case, in which J was seventeen years old at the time of her interview.

[13] General Statutes § 54-86*l* provides: "(a) Notwithstanding any other rule of evidence or provision of law, a statement by a child twelve years of age or younger at the time of the statement relating to a sexual offense committed against that child, or an offense involving physical abuse committed against that child by the child's parent or guardian or any other person exercising comparable authority over the child at the time of the offense, shall be admissible in a criminal or juvenile proceeding if: (1) The court finds, in a hearing conducted outside the presence of the jury, if any, that the circumstances of the statement, including its timing and content, provide particularized guarantees of its trustworthiness, (2) the statement was not made in preparation for a legal proceeding, (3) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement including the content of the statement, the approximate time, date and location of the statement, the person to whom the statement was made and the circumstances surrounding the statement that indicate its trustworthiness, at such time as to provide the adverse party with a fair opportunity to prepare to meet it, and (4) either (A) the child testifies and is subject to cross-examination at the proceeding, or (B) the child is unavailable as a witness and (i) there is independent nontestimonial corroborative evidence of the alleged act, and (ii) the statement was made prior to the defendant's arrest or institution of juvenile proceedings in connection with the act described in the statement.

"(b) Nothing in this section shall be construed to (1) prevent the admission of any statement under another hearsay exception, (2) allow broader definitions in other hearsay exceptions for statements made by children twelve years of age or younger at the time of the statement concerning any alleged act described in subsection (a) of this section than is done for other declarants, or (3) allow the admission pursuant to the residual hearsay exception of a statement described in subsection (a) of this section."

Section 8-10 of the Connecticut Code of Evidence codifies this provision.

[14] We note that it is not uncommon in these types of cases for a defendant to attempt to impeach the victim through the use of statements made in the forensic interview. In such cases, the court could consider whether the defendant has opened the door to the admission of other parts of the forensic interview as nonhearsay or under another hearsay exception.

[15] V testified that "SMH" stands for "[s]haking my head." She stated that J previously had used this phrase, as well as an expression used later in the text about "hitting someone up." V acknowledged on cross-examination that both expressions were common to her generation.

[16] We have excluded emojis from the quoted passage.

[17] The message used an abbreviated form of a name, consistent with that of J's sister.

[18] "Bf" reasonably could be interpreted to refer either to "boyfriend" or "best friend." The evidence established that J had a boyfriend during the time these messages purportedly were sent. In her interview, J indicated that she did not get along with girls generally, but she testified that she presently had a female best friend.

[19] In the interview, J said that she just called the defendant by his name and noted that he went by "Manny or Manuel."

[20] Even if we were to characterize the trial court's decision as too demanding an application of the correct standard and thus subject to review under the abuse of discretion standard, we would reach the same conclusion.

[21] A similar rule of evidence applies in many other jurisdictions; see, e.g., Fed. R. Evid. 901; and we have considered such sources when determining the contours of our rule. See *State* v. *Swinton*, 268 Conn. 781, 811–12 and n.28, 847 A.2d 921 (2004) (adopting factors utilized under rule 901 of Federal Rules of Evidence for purposes of conducting foundational analysis of computer generated evidence). See generally *State* v. *Foreman*, 288 Conn. 684, 721, 954 A.2d 135 (2008) ("[w]here a state rule is similar to a federal rule we review the federal case law to assist our interpretation of our rule" (internal quotation marks omitted)).

[22] The inquiry in the text message, "[w]hy you all of a sudden hit me up," is consistent with V's account that she had not been in contact with J for some time before she sent J a text message in early 2014.

[23] See also *Pierce* v. *State*, supra, 302 Ga. 395–96 ("Although there may exist evidence that a specific phone sent a certain text message, that does not prove who used the phone . . . . Every form of electronic communication can be spoofed, hacked, or forged. But this does not and can not mean that courts should reject any and all such communications. Indeed the vast majority of these communications are just as they appear to be—quite authentic. The goal is to supply sufficient, nonhearsay evidence as the identity of the source such that a reasonable [fact finder] could conclude that the evidence is what it is claimed to be." (Internal quotation marks omitted.)).

[24] Insofar as *State* v. *Eleck*, supra, 130 Conn. App. 632, indicates otherwise, it is overruled.