******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* KARIN ZIOLKOWSKI
## (SC 20801)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

### *Syllabus*

Convicted of the murder of her minor son, E, and of arson in the second degree, the defendant appealed to this court. The defendant claimed, inter alia, that the trial court had improperly admitted into evidence certain posts from her purported social media account and that the evidence was insufficient to find her guilty of the offenses of which she had been convicted. *Held*:

The defendant's claim on appeal that her inability to remember the twenty-four to thirty-six hour period surrounding the murder and arson deprived her of her constitutional right to a fair trial failed under the first prong of *State* v. *Golding* (213 Conn. 233) insofar as the defendant had not asked the trial court to make the requisite posttrial determination regarding the fairness of the trial, and, consequently, the record was inadequate for this court's review of this unpreserved claim.

The trial court did not abuse its discretion in admitting into evidence certain posts from the defendant's purported social media account, that court having correctly concluded that the posts were properly authenticated.

The testimony at trial was sufficient to satisfy the low bar for a prima facie showing of authenticity, and, although this court recognized the potential for manipulation in the context of electronically stored information, the threshold for authentication continues to be a modest one, and any doubts that existed with respect to the reliability or authorship of the posts went to the weight of the evidence rather than its admissibility.

The evidence was sufficient to support the defendant's conviction of murder, as the jury reasonably could have found from the cumulative force of the evidence presented at trial that it was the defendant who caused E's death and that she had the intent to do so.

The evidence was sufficient to support the defendant's conviction of arson in the second degree, as the jury reasonably could have found that the defendant started the fires that formed the basis of her arson conviction and that she did so with the intent to damage or destroy the family home and to conceal the murder of E.

Argued November 7, 2024—officially released January 28, 2025

*Procedural History*

Information charging the defendant with the crimes of murder and arson in the second degree, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Alander, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Hope J. Estrella*, deputy assistant public defender, for the appellant (defendant).

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, *Stacey M. Miranda*, supervisory assistant state's attorney, *Melissa Holmes*, assistant state's attorney, and *Lisa D'Angelo*, executive assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, C. J. Following a trial, the jury found the defendant, Karin Ziolkowski, guilty of murder in violation of General Statutes § 53a-54a (a) and arson in the second degree in violation of General Statutes § 53a-112 (a) (1) (B). For those crimes, the trial court sentenced the defendant to forty years of imprisonment. In this direct appeal, pursuant to General Statutes § 51-199 (b) (3), the defendant asserts that (1) her amnesia during a twenty-four to thirty-six hour period around the time of the incident in question prevented her from receiving a fair trial, (2) the trial court improperly admitted into evidence several postings on a Twitter (now X) account, and (3) there was insufficient evidence to find her guilty of murder and of arson in the second degree. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. For approximately one year before the incident in question, which occurred on or about November 14, 2016, the defendant and her husband had been estranged.

During that time, her husband was involved in extramarital affairs. At one point during this period, the defendant had moved out of the marital home in Meriden and into an apartment with her minor son, E. The defendant then became unable to pay the expense of the additional apartment and moved back in with her still estranged husband. Her husband continued to engage in extramarital affairs, was frequently absent, and failed to financially support the defendant and E. The situation was so difficult that the defendant wanted to move to North Carolina, but her husband forbade her from taking E with her.

Days before the incidents in question, the defendant made various posts on her Twitter account under the handle "@IamnotEliza." On November 10, 2016, she posted: "Fire extinguisher #takethatasyouwill." On November 11, 2016, she posted: "Empty promises #takethatasyouwill." On November 12, 2016, she posted: "Why did I have a child 😩😩." During this same period of time, the defendant also complained to friends and family about her husband, calling him "an asshole" and telling people that he refused to provide financial support.

On or about November 14, 2016, the defendant sedated E by giving him a substantial amount of diphenhydramine,[1] approximately twice the recommended dosage for an adult. The defendant also removed ductwork in the basement immediately below E's first floor bedroom. Thereafter, she used an accelerant to set two fires. She set one fire in the basement near the missing ductwork, immediately below E's bedroom. She set the second fire in another first floor bedroom.

At approximately 7 a.m., Meriden firefighters responded to a fire at the defendant's residence. When they arrived,

---

[1] "Diphenhydramine is an antihistamine with sedative properties that is found in many . . . medications, [including] Benadryl." (Internal quotation marks omitted.) *State* v. *LeRoya M.*, 340 Conn. 590, 598, 264 A.3d 983 (2021).

the firefighters observed smoke rising from the roofline. This indicated that none of the windows or doors was open, which limited the oxygen available to fuel the fire. A neighbor informed the firefighters that two people were inside. Finding all of the entrances locked and deadbolted, the firefighters forced open the front door to gain entry.

Once inside, the firefighters found that the house was filled with smoke. They discovered two separate fires: the fire in the basement, directly below E's bedroom, and a second fire in another first floor bedroom. Eventually, one of the firefighters discovered E and the defendant lying on a twin bed in E's bedroom. The firefighter did not have to move the defendant in order to move E. Instead, he placed both hands under E, lifted his "lifeless" body and exited the home. Once outside, he and the other firefighters tried to resuscitate E.

Thereafter, three firefighters removed the defendant from the home. She was unconscious and unresponsive. No other individuals were found in the home.

Paramedics transported E to MidState Medical Center in Meriden, where he was later pronounced dead. The defendant was taken to Hartford Hospital, where she was admitted. Upon admission, the defendant had a burn mark on one of her hands.

After an investigation, the fire department determined that the defendant had intentionally set the two fires using an accelerant that the state forensic laboratory later confirmed was on both her clothes and E's clothes. The accelerant was consistent with tiki torch fuel. A melted, cut open, tiki torch fuel bottle was found in the living room. Additionally, the police discovered that the batteries had been removed from the smoke and carbon monoxide detectors inside the home.

Subsequently, the medical examiner, Gregory Vincent, performed an autopsy on E. Vincent determined

that E's cause of death was homicidal asphyxia, with acute diphenhydramine intoxication as a contributing cause.[2] The autopsy revealed that E did not have any carbon monoxide in his blood, and there was no evidence of soot in his lungs, indicating that his death occurred before he inhaled any smoke from the fires. The state charged the defendant with the murder of E and arson in the second degree for intentionally starting a fire with the intent to conceal the crime of murder. The jury found the defendant guilty of both crimes.

This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

On appeal, the defendant claims that her inability to remember the twenty-four to thirty-six hour period surrounding the alleged offenses prevented her from receiving a fair trial. Specifically, she argues that her inability to remember prevented her from assisting her counsel in her defense or testifying at trial. In response, the state asserts that the defendant failed to preserve her claim and cannot prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), because the record is inadequate for review in that the defendant did not request a posttrial hearing regarding the fairness of the trial. The state contends that, without such a hearing, the trial court did not have the opportunity to make the requisite observations and findings regarding whether the defendant had received a fair trial and, therefore, that the record is inadequate to review the defendant's claim. We agree with the state that the record is inadequate for review, and, accordingly, the defendant's claim fails under the first prong of *Golding*.

---

[2] Vincent testified that diphenhydramine intoxication occurs when the effect of the drug exceeds the expected effect.

We begin with the legal framework that governs this claim. In *State* v. *Gilbert*, 229 Conn. 228, 640 A.2d 61 (1994), this court addressed whether the defendant's amnesia deprived him of the right to a fair trial. See id., 232–47. In doing so, this court adopted the framework set forth in *Wilson* v. *United States*, 391 F.2d 460, 463–64 (D.C. Cir. 1968), which "requires a trial court both to conduct a pretrial competency hearing and [to] make a posttrial determination as to whether the defendant had been able to perform the functions essential to the fairness and accuracy of the particular proceedings in which he [was] presently involved as measured by six factors . . . ."[3] (Citation omitted; internal quotation marks omitted.) *State* v. *Gilbert*, supra, 233; see also id., 236–37.

This court further explained that the *Wilson* framework "accords with the principle articulated by this court that in all cases involving what is or is not due process . . . no [hard-and-fast] rule can be laid down. The pattern of due process is picked out in the facts and circumstances of each case. . . . We continue to adhere to that position and agree with the many jurisdictions that have either followed the *Wilson* approach

---

[3] In *Wilson* v. *United States*, supra, 391 F.2d 460, the court identified the following six factors: "(1) The extent to which the amnesia affected the defendant's ability to consult with and assist his lawyer.

"(2) The extent to which the amnesia affected the defendant's ability to testify in his own behalf.

"(3) The extent to which the evidence in suit could be extrinsically reconstructed in view of the defendant's amnesia. Such evidence would include evidence relating to the crime itself as well as any reasonably possible alibi.

"(4) The extent to which the [g]overnment assisted the defendant and his counsel in that reconstruction.

"(5) The strength of the prosecution's case. Most important here will be whether the [g]overnment's case is such as to negate all reasonable hypotheses of innocence. If there is any substantial possibility that the accused could, but for his amnesia, establish an alibi or other defense, it should be presumed that he would have been able to do so.

"(6) Any other facts and circumstances [that] would indicate whether . . . the defendant had a fair trial." (Footnote omitted.) Id., 463–64.

strictly or have engaged in a factual analysis of the effect of amnesia on the fairness of the trial." (Citations omitted; internal quotation marks omitted.) Id., 237.

The following facts and procedural history are relevant to the resolution of this claim. Prior to trial, the defendant filed a request for a competency hearing pursuant to General Statutes § 54-56d.[4] The trial court granted the defendant's request. The trial court, *Clifford, J.*, conducted a hearing over the course of four days, during which it heard testimony from multiple experts, including Nadia Gilbo, a forensic psychiatrist who testified on behalf of the state, and David Lovejoy, a neuropsychologist who testified on behalf of the defendant.

At that hearing, Judge Clifford considered the defendant's claim that she could not receive a fair trial because of her amnesia. At the conclusion of the hearing, the trial court issued an oral ruling in which it observed that the party challenging competency bears the burden of overcoming the presumption in favor of finding a defendant competent. See General Statutes § 54-56d (b). The court, consistent with § 54-56d (a), then identified the two parts of the competency inquiry: first, whether the defendant was able to understand the nature of the proceedings against her, and, second, whether the defendant could assist counsel in her defense. The court acknowledged that the defendant's claim that her amnesia rendered her incompetent to stand trial presented a rather "unique" circumstance but observed that "the general proposition is that . . . having no recollection of a time period within which a crime was committed certainly does not bar a prosecu-

_____

[4] Although § 54-56d was the subject of amendments in 2024; see Public Acts 2024, No. 24-137, § 6; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

tion or lead to an automatic finding of incompetence to stand trial."

Relying on the testimony of Gilbo and Lovejoy, understood in the context of both *Gilbert* and *Wilson*, the trial court observed that the ultimate question was what, if any, effect the defendant's "amnesia [had] on the fairness of [the] trial." The court concluded that the defendant's amnesia did not implicate the first prong of the competency inquiry. The defendant, the court observed, "understands the function and role of all the players and personnel. She knows the charges and allegations. Quite frankly, she has an [intelligence quotient (IQ)] at the 92nd percentile, if my notes are accurate."

Instead, the trial court noted, the defendant's amnesia implicated the second prong of the competency inquiry. As to that prong, the court observed that Gilbo had testified that "the defendant has a present ability to assist counsel, [and] that the defendant understands her attorney has her best interest at stake. The defendant has a factual and rational understanding of the facts. She can look at options and decide between trial and plea bargaining. She can look at information that's supplied to her and make decisions. She's fully able to exercise and use her cognitive ability, and she has a good rapport with her counsel and certainly can [collaborate] with her." Lovejoy, the court noted, did not necessarily disagree with these observations. Rather, the court stated, Lovejoy "just disagrees as to the ability of the defendant to assist counsel because of the amnesia."

The trial court reasoned that "Lovejoy's opinion was that [the] defendant cannot assist her attorney in a defense if that defense requires her recollection. [The defendant] cannot testify [as to] what was in her mind [during the twenty-four to thirty-six hour period surrounding the alleged offenses], whether [she was] suffering from some kind of a mental breakdown. These

are things, according to . . . Lovejoy, that a defendant suffering from this [condition] cannot do over that time period. And, quite frankly, it's a commonsense argument that, if someone can't recall what happened leading to . . . crime[s] such as [arson] and murder, then how can [that person] assist in [his or her] own defense. . . . So . . . *Gilbert* and *Wilson* make it appear that there is almost this preliminary hearing, and, if [the court were to] find the defendant competent, it almost sounds like that same kind of a hearing could occur again. It could occur during the course of any trial, if there's going to be a trial. Things may arise concerning the overall fairness of the trial."

The trial court then went on to address the *Wilson* factors, particularly the last factor, which requires the trial court to consider any other facts and circumstances that would indicate whether the defendant had a fair trial. See *Wilson* v. *United States*, supra, 391 F.2d 464; see also footnote 3 of this opinion. The court observed that this final factor required it to "monitor and evaluate" in an ongoing manner during the course of the trial, and, in light of that obligation, the court reiterated that its "decision is really a preliminary one, and . . . the fairness of the trial will be the main issue."

At the end of its oral ruling, the trial court again emphasized the preliminary nature of its finding that the defendant was competent to stand trial: "I think it's going to be put to a future judge who hears all of the evidence to . . . under these factors that I just summarily went through . . . evaluate the fairness of the trial and whether things change at that particular time. So, for those reasons, I am finding that the defendant is competent at this time to go forward with the trial."

Thereafter, the case proceeded to trial before the trial court, *Alander, J.* Importantly, the defendant did not request any additional hearing or for Judge Alander

to make any determinations as to the fairness of the trial. In fact, the defense never revisited the issue of competence during or after the trial.

Although the defendant concedes that, after the trial court, *Clifford, J.*, issued its preliminary ruling, she did not again raise the issue of her competence before the trial court at any time, she asserts that her original motion for a competency hearing was sufficient to preserve her claim. We disagree. As the foregoing discussion demonstrates, our general case law and the trial court's specific ruling after the competency hearing in this case demonstrate that due process requires both a preliminary pretrial hearing and a posttrial hearing to determine the fairness of the actual trial that occurs. By failing to request a posttrial hearing to determine the fairness of the trial, the defendant failed to create a record that would enable this court to review whether the defendant was able to assist and participate in her defense, and, therefore, the record is inadequate to review her claim that her lack of memory surrounding the incidents in question deprived her of her constitutional right to a fair trial.

The same considerations lead us to conclude that the defendant cannot obtain relief under *Golding*. We have explained that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third

prong of *Golding*). "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Gray*, 342 Conn. 657, 668, 271 A.3d 101 (2022).

The state asserts that the defendant's claim fails under the first prong of *Golding* because the judge who presided over the trial never made the requisite posttrial determination regarding "whether the defendant had been able to perform the functions essential to the fairness and accuracy of the particular proceedings in which [s]he [was] presently involved as measured by [the] six factors" identified in *Wilson* v. *United States*, supra, 391 F.2d 463–64. (Internal quotation marks omitted.) *State* v. *Gilbert*, supra, 229 Conn. 233. We agree with the state. As we discussed, both *Gilbert* and *Wilson* are premised on the understanding that memory loss itself is not enough to demonstrate a lack of fairness at trial and that the fair trial determination can be made only after the trial court engages in a fact intensive inquiry into the *Wilson* factors on the basis of its own observations at trial. See id., 233, 236–37. In this case, the defendant did not request that the trial court conduct any such inquiry, despite being told before trial that the ultimate fair trial determination must be made by "a future judge who hears all of the evidence . . . ." Consequently, the trial court made no determination as to whether the defendant's amnesia impacted the fairness of the trial.

Without such a hearing or any determination by the trial court related to the fairness of the trial, we conclude that the record is inadequate for review, and, therefore, the defendant's claim fails under the first prong of *Golding*.

## II

The defendant also claims that the trial court abused its discretion in admitting evidence regarding three posts on a Twitter account, which the state attributed to the defendant. The defendant asserts that the trial court should not have allowed these Twitter posts to be admitted into evidence because they were not properly authenticated. We conclude that the trial court did not abuse its discretion in admitting the three Twitter posts after concluding that they were properly authenticated.

At trial, the state offered the testimony of the defendant's aunt, who stated that she communicated with the defendant on a regular, almost daily basis regarding their lives. The aunt further testified that she followed the defendant's posts on Facebook and that she routinely communicated with the defendant through private messaging on Facebook. The aunt also explained that the defendant maintained a Twitter account under the handle "@IamnotEliza" and that the aunt frequently communicated with the defendant through private messages, or direct messages, on Twitter. The aunt explained that she knew that the defendant operated this Twitter account because the defendant had told her so. The aunt further testified that the substance of their private messages through the Twitter account was consistent with their telephone conversations and text messages. The aunt further testified that the defendant sometimes posted photographs of herself on that same Twitter account.

During her testimony, the aunt mentioned three particular posts on the defendant's Twitter account that were posted during the week prior to E's death. Defense counsel objected and requested a hearing outside the presence of the jury. The trial court excused the jury, and the prosecutor conducted a voir dire of the aunt in order to authenticate the three posts she had seen

on the defendant's Twitter account. The aunt explained that she had accessed the account from her cell phone shortly after E's death and that it was the same account through which she had communicated with the defendant in the past. With respect to the three Twitter posts, she identified each of them as posts that were made by the defendant. The aunt also testified that she had communicated with the defendant through this account over a period of a couple of years and that, during that time, she had never known anyone other than the defendant to use the account or to post anything on it. The aunt further testified that, after seeing the three posts, she brought her cell phone to the police department and showed the police the posts.

Thereafter, defense counsel also questioned the aunt about the Twitter account. They engaged in the following colloquy:

"Q. . . . [D]o you have to sign into Twitter with . . . a username or password?

"A. Yes.

"Q. Okay. And that's how you signed into your own account?

"A. Correct.

"Q. Okay. But the posts that you're—you were just shown, those were public, meaning anybody could see them, correct, who—

"A. Yes.

"Q. —signed into their account?"

The trial court then heard argument from both the prosecutor and defense counsel regarding the authenticity of those Twitter posts. The trial court ultimately concluded: "I've read *State* v. *Smith*, [100 Conn. App. 313, 917 A.2d 1017, cert. denied, 282 Conn. 920, 925

A.2d 1102 (2007)]. I've also read, which I think is apropos, *State* v. *Manuel T.*, [337 Conn. 429, 254 A.3d 278 (2020)], and authentication is . . . a low burden. The state just simply needs to show prima facie evidence that the defendant was the author of these messages. I think [that the state did] that because the defendant has admitted [to her aunt] that this is her account, [and the aunt] communicated with [the defendant] through this account over a number of years. [The defendant's aunt has] also seen personal details and . . . photos on this account that are unique to [the defendant]. So, I think the state has met its . . . burden.''

After the trial court overruled defense counsel's objection, the prosecutor introduced into evidence screenshots of the three posts from the Twitter account under the handle "@IamnotEliza." Defense counsel objected again, and the trial court overruled the objection. The first post was dated November 10, 2016, and read: "Fire extinguisher #takethatasyouwill." The second post was dated November 11, 2016, and stated: "Empty promises #takethatasyouwill." The third post was dated November 12, 2016, and read: "Why did I have a child," followed by sad face emojis.

The following legal principles guide our analysis of the defendant's claim. The Connecticut Code of Evidence provides that "[t]he requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a). "[A] writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Manuel T.*, supra, 337 Conn. 453.

"It is widely recognized that a prima facie showing of authenticity is a low burden." Id., 454. As the com-

mentary to the Code of Evidence explains: "Before an item of evidence may be admitted, there must be a preliminary showing of its genuineness, i.e., that the proffered item of evidence is what its proponent claims it to be. The requirement of authentication applies to all types of evidence, including . . . electronically stored information . . . . The category of evidence known as electronically stored information can take various forms. It includes, by way of example only, email, Internet website postings, text messages and 'chat room' content, computer-stored records, data, metadata and computer generated or enhanced animations and simulations. As with any other form of evidence, a party may use any appropriate method, or combination of methods, described in this commentary, or any other proof to demonstrate that the proffer is what its proponent claims it to be, to authenticate any particular item of electronically stored information. . . . The proponent need only advance 'evidence sufficient to support a finding' that the proffered evidence is what it is claimed to be. Once this prima facie showing is made, the evidence may be admitted, and the ultimate determination of authenticity rests with the fact finder." (Citations omitted.) Conn. Code Evid. § 9-1 (a), commentary.

We have observed in the past that the concern about the admissibility of certain electronic communications, such as emails, "is that [they] are inherently unreliable because of their relative anonymity and the fact that [although] an electronic message can be traced to a particular computer, it can rarely be connected to a specific author with any certainty. Unless the purported author is actually witnessed sending the [email], there is always the possibility it is not from whom it claims. . . . [A]nybody with the right password can gain access to another's [email] account and send a message ostensibly from that person." (Internal quotation marks omitted.) *State* v. *Manuel T.*, supra, 337 Conn. 460. Our

response to that concern, however, was that "the same uncertainties exist with traditional written documents. A signature can be forged; a letter can be typed on another's typewriter; distinct letterhead [stationery] can be copied or stolen. . . . We see no justification for constructing unique rules of admissibility [for] electronic communications such as instant messages; they are to be evaluated on a case-by-case basis as any other document to determine whether . . . there has been an adequate foundational showing of their relevance and authenticity. . . . [Q]uestions about the integrity of electronic data generally go to the weight of electronically based evidence, not its admissibility." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) Id., 460–61.

In the present case, the defendant asserts that the authentication was not sufficient because the state did not present evidence of any distinctive features of the Twitter posts or account. We disagree. It is well established that an appropriate method of authentication is for a witness with personal knowledge to testify that the offered evidence is what its proponent claims it to be. See, e.g., *State* v. *Swinton*, 268 Conn. 781, 802, 847 A.2d 921 (2004) (standard for introducing photographic evidence is to do so "through a witness competent to verify it as a fair and accurate representation of what it depicts"); see also, e.g., Conn. Code Evid. § 9-1 (a), commentary. That is precisely what occurred here.

The aunt testified that she and the defendant were close and regularly communicated. She testified that she spoke with the defendant via phone and frequently communicated via email and private messaging on Facebook and Twitter. She also testified that she followed the defendant's Facebook page and her Twitter account. The aunt testified that the defendant had told her that she had a Twitter account under the handle "@IamnotEliza" and that the handle was related to one

of the defendant's favorite characters in a musical—
Eliza Doolittle. The aunt further testified that she
believed that the posts on the account were from the
defendant because the subjects about which she com-
municated with the defendant via the Twitter account
were similar to the ones about which they spoke over
the phone and texted about. We agree with the trial
court that this testimony was sufficient to meet the low
bar for authentication.

The defendant asserts that the authentication in the
present case was not sufficient because the aunt was
not able to testify that she received the messages or
to establish that the defendant was the author of the
messages. We disagree.

Although we recognize that the potential for manipu-
lation exists in the context of electronically stored infor-
mation, including social media posts like the ones at
issue in the present case, the fact that such information
can potentially be modified, forged or fabricated does
not necessarily lead to the conclusion that it is inadmis-
sible unless any possibility of corruption has been defin-
itively ruled out. Again, technological developments
have made virtually any form of evidence subject to
potential manipulation: signed or unsigned documents,
visual and aural recordings, telephone calls and photo-
graphs are common examples. The threshold standard
for authenticating this evidence, however, continues to
be a modest one.[5] See, e.g., *State* v. *Valentine*, 255 Conn.
61, 77–78, 762 A.2d 1278 (2000). As we previously
explained in *Manuel T.*, once a prima facie foundation
is laid, whatever doubts might exist with respect to the

---

[5] We are mindful that, as the world continuously confronts constantly
evolving and more sophisticated technology, such as artificial intelligence,
the rules of evidence may need to adapt. Under the facts and circumstances
of the present case, however, we conclude that our rules of evidence provide
the appropriate framework for the authentication of the Twitter posts and
that the low threshold for authentication was met.

reliability of the source of the messages typically go to the weight, not the admissibility, of the messages. See, e.g., *State* v. *Manuel T.*, supra, 337 Conn. 461. Defense counsel was free to argue to the jury that it should not conclude that the state had established that the defendant was the author of the Twitter posts on the basis of the evidence provided. But we cannot conclude that the trial court abused its discretion in admitting the Twitter posts into evidence based on the showing made here.

### III

We next address the defendant's claim that the evidence was insufficient to sustain her conviction of murder in violation of § 53a-54a (a) and her conviction of arson in the second degree in violation of § 53a-112 (a) (1) (B).

The following well established principles govern our review. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether [on] the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Daren Y.*, 350 Conn. 393, 399, 324 A.3d 734 (2024).

### A

We first address the defendant's claim that there was insufficient evidence to support her conviction of murder. Specifically, the defendant contends that the state did not establish her identity as the person who killed E or that she intended to kill him. The state asserts that

there was sufficient evidence to support the defendant's conviction of murder.[6] We agree with the state.

Section 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ." In the present case, the evidence at trial was sufficient for the jury to find, beyond a reasonable doubt, both that it was the defendant who caused E's death and that she intended to do so.

First, we address the sufficiency of the evidence to establish that it was the defendant who caused the death of E. The evidence showed that, when the firefighters arrived at the defendant's home, all of the entrances were locked and deadbolted. After having to use force to gain entry, they discovered that the defendant and E were the only individuals in the home. Furthermore, John Cerejo, a detective with the Meriden Police Department, testified that the defendant's estranged husband, who was the only other resident, was not at home and was with his girlfriend, "quite a ways" away, at the time of E's death. See, e.g., *State* v. *Patrick M.*, 344 Conn. 565, 574–75, 280 A.3d 461 (2022) (reasoning that evidence was sufficient to support defendant's conviction

---

[6] The state points out that the defendant's position on appeal is contrary to her position before the trial court. Specifically, the state asserts that, in her motion for a judgment of acquittal, the defendant claimed that the state had failed to introduce evidence of (1) motive, (2) the mechanism of asphyxiation, and (3) any history of the defendant's physical abuse of E. The state also asserts that, at trial, defense counsel did not dispute that the defendant had killed E but argued instead that E's death was accidental. "To the extent that the defendant's sufficiency claims were unpreserved, we observe that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of [*State* v. *Golding*, supra, 213 Conn. 239–40]. There being no practical significance, therefore, for engaging in a *Golding* analysis of an insufficiency of the evidence claim, we will review the defendant's challenge to his conviction . . . as we do any properly preserved claim." (Internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 767 n.4, 36 A.3d 670 (2012).

because he had opportunity and means to commit crimes with which he was charged). Additionally, although the defense's theory changed course in this appeal, defense counsel argued to the jury that the defendant did cause the death of E but that it was an accident. Defense counsel claimed that the defendant rolled over onto E and accidentally killed him. Nevertheless, the evidence that the defendant was the sole person, other than E, in the locked house at the time of the fires and E's death was sufficient to establish a reasonable inference that she was responsible for causing E's death.

Second, the evidence also established that the defendant had the intent to cause E's death. At trial, Vincent testified that E's death was not the result of natural causes or an accident but, instead, was caused by homicidal asphyxiation. Vincent predicated his conclusion on several pieces of evidence. To begin, he testified that E had a substantial amount of diphenhydramine in his system—at least two times the amount that Vincent would expect to see in an adult who has taken the recommended dose. Vincent testified that the amount of diphenhydramine would have made E easy to subdue. Vincent concluded that diphenhydramine intoxication was a contributing cause of death. He also relied on the fact that E was sedated—which Vincent did not believe E did to himself—to conclude that E's death was not accidental.

Vincent testified that he ruled out the possibility that the fires caused E's death. He pointed out that there was no carbon monoxide in E's blood and no soot in his lungs, and, thus, that there was no evidence that E had inhaled smoke. He concluded, therefore, that E "died from an asphyxial mechanism caused by somebody else . . . ." "Asphyxiation," Vincent testified, is a "broad term" that means "without oxygen" and is caused by external or internal blockage of the airways or from neck compression. There were signs, Vincent

testified, of strangulation. Specifically, Vincent pointed out that the presence of numerous petechial hemorrhages[7] on E's face and around his eyes was consistent with strangulation. Vincent also explained that E had "blanching"[8] around his nose and mouth, which could have resulted from the nose and mouth being blocked. In addition, he identified "a distinct pale line" on E's neck, which was consistent with a ligature having been tied around E's neck to strangle him. Vincent could not, however, rule out the possibility that the pale line was merely the result of lividity.[9]

The state also presented evidence that the defendant had a motive to kill E. "Although motive is not an element of the crime of murder that the state must prove beyond a reasonable doubt, we have nonetheless held that an intent to kill may be inferred from evidence that the defendant had [a] motive to kill." (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 73–74, 43 A.3d 629 (2012). At trial, the evidence established that the defendant's situation with her husband had escalated to a point that she found intolerable and that caused her emotional distress. The evidence showed that the defendant's husband was having an extramarital affair and that the defendant had moved out of the family home with E but had returned when she did not have sufficient money to keep a separate apartment. Additionally, the evidence at trial established that the defendant's husband was not providing sufficient finan-

---

[7] "Petechiae" are "[m]inute hemorrhagic spots, of pinpoint to pinhead size, in the skin, which are not blanched by pressure." Stedman's Medical Dictionary (28th Ed. 2006) p. 1468.

[8] Merriam-Webster's Collegiate Dictionary defines "blanch" as "to take the color out of" or "to make ashen or pale"; Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 130; which, according to Vincent, refers to the lack of lividity.

[9] "Livor" is "[t]he livid discoloration of the skin on the dependent parts of a corpse. [L. a black and blue spot]." Stedman's Medical Dictionary (28th Ed. 2006) p. 1112.

cial support for her and E and that he was not helping to pay for the phone bill, rent or food. The evidence also established that the defendant wanted to move out of state with E but that her husband would not let her. The evidence showed that all of these issues caused the defendant to be very angry with her husband. The state also presented evidence at trial that, in the days before E's death, the defendant posted a variety of alarming comments to Twitter, such as "[w]hy did I have a child," "[e]mpty promises #takethatasyouwill," and "[f]ire extinguisher #takethatasyouwill."

The state also presented evidence of the defendant's conduct after the fires that the jury could have relied on in support of its finding that the defendant had intended to cause E's death. The social worker who met with the defendant when she arrived at the hospital testified that the defendant had never asked about what happened to E or how he died. The jury properly could have credited that testimony as evidence tending to show the defendant's intent to kill E. See, e.g., *State* v. *Mejia*, 233 Conn. 215, 225, 658 A.2d 571 (1995) (jury was free to infer intent to kill from defendant's failure to show concern for coworker's welfare after shooting him). In addition, the aunt testified that, when she visited the defendant before E's funeral, the defendant never cried or became upset, even when discussing how she likely could not attend his services. On the basis of the defendant's lack of an emotional response to E's death, the jury could have reasonably inferred that she had intended to and did cause E's death. See, e.g., *State* v. *Otto*, supra, 305 Conn. 66 ("[b]ecause direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom" (internal quotation marks omitted)). Viewing the foregoing evidence in the light most favorable to sustaining

the verdict, we conclude that the jury reasonably could have found that the cumulative force of the evidence established the defendant's guilt of murder beyond a reasonable doubt.

B

We next address the defendant's claim that the evidence was not sufficient to support her conviction of arson in the second degree. Specifically, the defendant alleges that, because the evidence was not sufficient to support her conviction for murder, and because the state charged her with setting the fires to conceal the murder, the evidence was also insufficient to find her guilty of arson in the second degree. She also asserts that the evidence did not establish that she set the fires. The defendant further claims that, even if the evidence showed that she set the fires, it did not demonstrate that she set the fires to cover up E's murder. Instead, the defendant argues that the evidence demonstrates that she started the fires in an attempt to commit suicide. We find no merit in these arguments.

Section 53a-112 (a) provides in relevant part: "A person is guilty of arson in the second degree when, with intent to destroy or damage a building, as defined in section 53a-100, (1) he starts a fire . . . and . . . (B) such fire . . . was intended to conceal some other criminal act . . . ." In this case, the evidence established each of these elements beyond a reasonable doubt.

Much of the same evidence that defeats the defendant's sufficiency claim as it relates to her murder conviction; see part III A of this opinion; also compels us to reject her challenge to the sufficiency of the evidence to support her second degree arson conviction. The state introduced sufficient evidence to support the jury's finding that the defendant had set the fires to

conceal the murder of E.[10] We have already determined that the evidence at trial was sufficient for the jury to find that the defendant intentionally caused E's death. The jury also reasonably could have concluded, on the basis of the evidence before it, that E died before the defendant set the fires. Vincent testified that E had no carbon monoxide in his blood and no soot in his lungs, which indicates that E did not inhale any smoke prior to his death. Moreover, during defense counsel's closing argument, counsel argued that the defendant had set the fires. In fact, the defense's theory at trial was that the defendant set the fires but did so to commit suicide.

Even separate and apart from the evidence connecting the arson to the murder, the evidence at trial was sufficient to demonstrate that the defendant had started the fires. At trial, Steven Trella, Meriden's fire marshal, testified that the two fires in the defendant's home were independently and deliberately set using an accelerant. As we discussed in part III A of this opinion, the evidence established that, when the firefighters arrived on the scene, the defendant and E were the only individuals in the home, and the doors were locked and deadbolted.

---

[10] The defendant asserts that, even if the evidence shows that she set the fires, her sole intent was to commit suicide when she started the fires rather than to conceal E's murder. We are unpersuaded because, when evaluating sufficiency claims, "we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Rhodes*, 335 Conn. 226, 229, 249 A.3d 683 (2020); see, e.g., *State* v. *Ramey*, 127 Conn. App. 560, 567–68, 14 A.3d 474 (rejecting defendant's theory that, because suicide was his primary goal, he lacked specific intent to damage or destroy building), cert. denied, 301 Conn. 910, 19 A.3d 177 (2011). The jury did not have to disbelieve that the defendant had intended to commit suicide to reasonably conclude that her intent in setting the fires included an intent to cover up the murder of her son, E. Even if the jury believed that she had intended to die in the fire and that her survival was not her intent, it could still believe that, by setting the fire, she intended to cover up evidence that she murdered E, so that it would appear that he, too, died as a result of the fire.

The evidence also established that the defendant had fire accelerant on her clothing and a burn on one of her hands. See, e.g., *State* v. *Stephenson*, 207 Conn. App. 154, 181, 263 A.3d 101 (2021) (reasoning that intent to commit arson in second degree can be inferred when flammable liquid is present), cert. denied, 342 Conn. 912, 272 A.3d 198 (2022). The burn on one of the defendant's hands is significant because the evidence demonstrated that the fires never made it to E's bedroom, where the firefighters found E dead and the defendant unconscious. The jury reasonably could have inferred that the burn was related to the defendant's having started the fires before she went to lie down next to E.

The state also produced evidence that, approximately four days before the fires, the defendant posted on Twitter: "Fire extinguisher #takethatasyouwill." A reasonable jury could infer that the defendant's post only four days before the fires is further evidence that she intended to start the fires.

The state also produced sufficient evidence at trial to support the jury's finding that the defendant had intended to damage or destroy the home. Cerejo testified that the smoke and carbon monoxide detectors in the home were disconnected and that the batteries were removed prior to the fires. The state also produced evidence that the ductwork below E's bedroom, near where one of the fires was set, was removed. A reasonable jury could infer that the ductwork was removed to allow the fire to move more easily throughout the home. Given that a jury may infer that a defendant intends the natural consequences of her actions, the jury reasonably could have inferred that the defendant set the fires and did so with the intent to damage the home. See, e.g., *State* v. *Gary*, 273 Conn. 393, 407, 869 A.2d 1236 (2005) ("it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended

the natural consequences of his voluntary conduct" (internal quotation marks omitted)).

Additionally, the state presented the testimony of Allison Gingell, a forensic examiner with the state forensic laboratory, who testified that testing of E's clothing revealed the presence of the same accelerant as the tiki torch fuel in the melted bottle found in the home's living room. The jury reasonably could infer that the defendant had doused E in accelerant in hopes of making it appear like he died in the fire, thereby concealing that she asphyxiated him. In fact, according to the testimony at trial, the only reason why the fire did not reach E's room was because the home was sealed shut, thus depriving the fire of oxygen.

Finally, given that the defendant set one of the fires directly below E's bedroom and removed the ductwork from the basement to his room, a reasonable jury could infer that the defendant had intended for the fire to travel up to E's room, where he was found lying on the bed, already subdued with a large dose of diphenhydramine and asphyxiated, with accelerant on his clothes. Although a firefighter testified that the fire was oxygen deprived and, therefore, the flames did not travel far, a reasonable jury could infer that the defendant had intended the flames to reach E but simply miscalculated the effect that the lack of oxygen would have on blunting the spread of the fire.

Viewing the evidence introduced at trial in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found that the evidence established the defendant's guilt of arson in the second degree beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other justices concurred.